Long *vs.* The State of Georgia.

JOHN A. LONG, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

| 38 | 491 |
| 100 | 557 |
| 38 | 491 |
| 119 | 436 |
| 38 | 491 |
| 120 | 153 |
| 38 | 491 |
| 125 | 308 |
| 38 | 491 |
| 129 | 423 |

I. It is too late after arraignment, and the case is before the jury, to object to an indictment on the ground that it fails to allege the residence of the defendant.

2. When it appeared from the record that the venue in a murder case was changed, on the motion of the prisoner, at the April Term, 1868, from Gordon to Bartow county, and the case was called for trial at the November Term, 1868, of Bartow Superior Court, the defendant is *charged* with notice that the case will then and there be called, and he cannot excuse himself for want of diligence in preparing for trial, by his affidavit that he did not know the case had been moved to Bartow county, and would be called for trial at the next regular term.

3. The simple fact that the defendant has been in jail, in a distant county, does not excuse him for want of diligence in preparing for trial.

4. The unexplained absence of the counsel, on whom the defendant "mostly relies," is not a good ground for continuance.

5. When a motion is made to continue a criminal case, at the calling of the case, the movant must take all his grounds; he cannot, after his motion has been overruled, file a special plea, based upon facts known at the time of the first motion, and then move to continue because not ready to try that plea.

6. This Court will not interfere with the judgment of the Circuit Judge in a matter left by law in his wise, legal discretion, unless it appears affirmatively that the discretion has been abused.

7. The plea of insanity, provided for in section 4234 of Irwin's Code, is, in its nature, a plea, the object of which is to prevent a trial on the merits, and though it may cover insanity at the time of the act, its essence is that the prisoner is insane at the trial, and it must contain that allegation.

8. It is not error for the Court, in a criminal case, to refuse to charge the jury that if from *any cause* they have doubts of the prisoner's guilt, they must acquit, and to charge instead, that *any cause* is too sweeping, but that if they have any reasonable doubts which arise from, or grow out of the evidence, they must acquit.

9. The jury, in a murder case, have no right in this State authoritatively to recommend, in lieu of the death penalty, imprisonment for life, except in cases where the conviction is founded solely on circumstantial evidence, and it is no ground for a new trial that the Judge in this case said to the jury, "if there are palliating circumstances, or good legal reasons, you may so recommend."

Murder. Motion for new trial. Decided by Judge PAR-ROTT. Bartow Superior Court. September Term, 1868.

John Long, as principal, and John C. Duff, as accessory, were indicted for murdering Abraham B. Echols, in Gordon county, Georgia, on the 16th of October, 1866. The bill of indictment was silent as to where they resided. Because a jury could not be had in Gordon county, in April, 1868, the Judge, on motion of prisoner, ordered that said case should be tried in Bartow county. On the 21st of September, 1868, the case was called, and the defendant's attorneys stated that they intended pleading insanity, and asked the Judge for an officer to send for witnesses; but he said it would be time enough when the issue was made. On the 24th of September, 1868, the case was called for trial. When Long was arraigned his attorneys wished to plead nothing but insanity; the Court required a plea of "guilty" or "not guilty," and thereupon they plead "not guilty" and insanity at the time of the killing. Simultaneously Long moved for a continuance upon the grounds: 1st. That Nicklin was his attorney, on whom he mostly relied, and whom he had partly paid; that he was absent, as he believed, because he had not been informed that said case had been transferred from Gordon county; that Long himself did not know of this transfer till the 22d instant, when the officer went for him to Milledgeville, Baldwin county, where he had been confined since the finding of the bill of indictment; that he had had no opportunity of corresponding with Nicklin; that he believed Nicklin believed said case would

Long vs. The State of Georgia.

be tried in Murray or Dade county, he particularly having exerted his influence in having the venue changed; that he was satisfied neither Nicklin nor his other counsel knew that this case would be called in that Court till the week before or the week before that. 2d. Because of the absence of John Hays, T. L. Cox, R. B. Hackney, William Thompson, E. J. Kiker, William Black, Aronstead Abbott, V. Carter, and J. C. Fain, (of Gordon county, he believed;) that he had ordered *subpœanas* for them, and believed they had been served; that they were not absent by his consent or procurement, and that he expected to get their testimony next term; that he expected to prove by said witnesses that when Echols was killed, Echols was approaching him (Long) with a pistol in hand and another man by his side with a gun in his hand, and both in the act of shooting at Long, and expected to show such acts on the part of deceased as would make out a complete justification for Long; that he positively knew that three or more of said witnesses were present at the time, knew all the facts, and would be compelled to testify as aforesaid, and finally, that this motion was not made for delay, but to obtain a fair trial.

The Judge asked what facts the defendant expected to show by each of said witnesses, but his counsel would not change the form of the motion. The continuance was not granted, but for some cause, unexplained by the record, the case did not proceed then.

The case was again called on the 28th of September, 1868. The attorneys reiterated his showing for a continuance as to Nicklin's absence, and asked a continuance for the further reasons of the absence of J. N. Carter, of Hall county, T. L. Cox, of Whitfield county, who had been *subpœnaed*, and of Wm. Lewis, of Pickens or Gilmer county, whose name he had just ascertained, by whom he would prove the facts aforesaid as to Echols approaching him with a pistol at the time of the killing. The formal parts of the showing were all correct. His attorneys introduced John Hays to prove that Lewis and Cox were present at the killing, and Hays stated that there were three other persons present in Court who were present

at the killing. The Court refused to allow the continuance. A special jury was empannelled to try the issue of insanity.

On the 29th of September, 1868, they again moved to continue, submitting as a showing an affidavit by Long that he was not ready to proceed with the issue of insanity because of the absence of Campbell Wallace and twenty-seven other witnesses, (naming them,) of Walker county, Georgia, by whom he expected to prove that, at the time of the killing, Long was laboring under insanity or mental aberration, and that he had been, for some time previously, so afflicted, and because of the absence of said Lewis, said Cox, and said Carter, by whom he expected to prove the same facts. With this was an affidavit by Jesse A. Glenn, one of Long's attorneys, stating that on the 21st of September, 1868, he had asked for an officer to send for these witnesses, having stated his intention to plead insanity as aforesaid, and that the Court would not then send, and that, at each calling of the case since, he had notified the Solicitor General of his intention to rely on said plea. The Court ordered the case to proceed. The defendant's attorneys offered no testimony, nor would offer any. Thereupon, the Court ordered the plea of insanity stricken, and that the case should be tried under the plea of not guilty.

The case was submitted to the jury, and a witness for the State was sworn and was about to be examined. Then Long's attorneys moved to quash the indictment because the indictment was silent as to Long's residence; it wanted the words "of the county and State aforesaid" after the defendants' names.

The Court overruled the motion, holding that that averment was unnecessary.

The testimony for the State was as follows:

R. C. Boon sworn said: I was present when deceased was killed, in October, 1866, I think the 10th, in Gordon county; I first saw Long at Calhoun; he was in search of a horse on Wednesday evening; I and Mr. Echols went home from Court; I was eating supper and heard a noise in the lane; sent my son out to see; heard some one coming, and saw Long

threatening to shoot my son, with pistol in hand; Long said he would shoot me if I came where he was; he then got on his horse and galloped off between my house and Echols'; I know Long, and know it was the same man with Duff, and that the horse Long had, there was a dispute about; Long rode off up the lane; he was bareheaded and the horse was without a saddle; I was standing in the yard; he rode on back; deceased was feeding his hogs as Long rode back; Long called to deceased to come to him; deceased said he would be there in one minute; deceased went to the porch, set his bucket down, turned back toward where Long was, and asked Long what he wanted; Long said he was hunting an horse thief; deceased asked Long what kind of an horse; Long said a gray horse, as well as I recollect; deceased asked who stole the horse; Long answered "Adair"; deceased said nothing more, that I heard; Mr. Cox asked Long if he were not the man who passed there a few minutes before; Long said he was not; Cox asked Long why he had no saddle, and why he was bareheaded; Long said he lost his hat while hunting this thief; Cox asked Long who were with him; he said two or three men were with him, and then fired at deceased and killed him; I remember nothing that was said, if anything was; Long then rode off and hallooed; Cox said, "follow him, gentlemen;" Long hallooed back and said, "come on and I will wait for you;" the pistol ball struck deceased just over the left eye, and the ball lodged in the back part of his head; I examined the wound; Long was about three feet from deceased when he shot; there was only deceased's fence between them; deceased was on the side of the fence next to his house; the killing was between sunset and dark; deceased had been home some hour before he was killed; deceased was Clerk of the Superior Court; it was two hours, by the sun, when I and deceased went home; when the pistol fired deceased dropped back and fell; don't suppose he moved after he was shot; Long went away, after the shooting, as fast as his horse could go; I saw Long several times between Monday and Wednesday; never saw the horse till Long, Duffy and King

brought him in and were disputing about him; Long did the shooting; Cox was somewhere in the yard when Long came up; Miller was in the yard, between the house and the fence; Cox was by the side of the deceased when he was shot; Miller was on the left and Cox on the right of deceased when he was shot; I was a juryman, that week, in Gordon county; was in Court Monday, Tuesday and Wednesday, and deceased was discharging his duty as Clerk; my house is some fifty yards from deceased's; I was sworn on the com mitting trial in this case; I swore then that deceased was about feeding his hogs; I was saddling my horse as Long came between deceased's house and mine; I heard the conversation between Cox, Long and deceased; deceased was standing against the fence, and had his foot on it; the fence was some forty feet from deceased's house; I am not positive whether it was Monday or Tuesday, when I first saw Duff; I served on the jury three days that week; was on the petit jury; I have had no conversation as to what I should swear in this case; I was some thirty feet from deceased when he was shot.

WILLIAM MILLER sworn, said: I was with deceased when he was killed, not more than five feet from him; it was in Gordon county, Wednesday night, 10th October, 1866, between sun-down and dark; deceased was standing at his gap, in front of his dwelling-house, on the inside of the fence, about fifteen steps from his dwelling-house; I saw him when he went to the gap; he and I first went to the gap; we were going to feed the hogs, and were at the gap to pour in their slop; I returned to set my bucket down, and returned to the piazza; I and deceased walked on in the direction of the gap; the man who shot deceased was sitting on his horse at the fence; deceased said to that man "how do you do?" the man said he was hunting a horse-thief; deceased asked him whom he suspected; he answered, "a man named Adair;" "very well," said deceased; the man who shot deceased said, "hold on a minute or two, and I will assist you;" a word or two passed, but nothing in anger, when that man drew his pistol and shot deceased down by the fence, not being over three

Long *vs.* The State of Georgia.

feet from deceased when he shot him; the man immediately dashed off and brought a scream as he did so.

I can not identify Long as the man who shot; the man was a stranger to me; he was on a gray horse; the horse was without a saddle, and the man bareheaded; deceased, and the man who shot him, did not converse more than fifteen minutes before deceased was shot; deceased fell to the ground at the crack of the gun; (I suppose the shot was with a pistol;) the man instantly left, after the shooting, as fast as his horse could go; I went to deceased immediately; he never moved hand or foot, nor breathed, after he was shot; he was struck just over his left eye; I saw blood escaping from the ball-hole and from the ears; I think the bone of the skull, in the back part of the head, was broken; Mr. Cox and I were present when deceased was shot; Boon was near by, but did not see him when deceased was shot; Boon was not present at the shooting; no one but myself and Cox were present, so far as I know; I was at work for deceased; Cox went out of the house with deceased; we went out in the first place to feed the hogs.

K. C. Boon re-introduced, said; When I first saw Long, he was very drunk; deceased had no weapons when he was killed, and was making no effort to hurt Long.

William Miller re-introduced, said: I did not see deceased, Cox, or any one at deceased's house, have any kind of weapons; no angry words was said by deceased to prisoner in any way; they might have had arms without my knowing it.

J. W. Reaves sworn, said: I was not present when deceased was killed; I saw wound right above left eye, made by a ball; it passed through the head and lodged against the skin on the opposite side; the skull was broken, back and front; I saw brains and blood escaping from the wound; I have seen Long before, saw him in Calhoun on the day before deceased was killed; saw Long frequently during that day; the first time I saw him he was holding a horse owned by Mr. Duff, a gray or white horse; I don't remember about the horse being saddled; the next time I saw him was the day

after the killing, about two or three o'clock; Long was on the same horse, in the woods, about a mile to the left of Calhoun; he was bareheaded, and the horse was without a saddle; Long, the prisoner, is the man I saw the day of the killing; the whole county was in pursuit of him, because he was charged with killing deceased; it was from 1 to 10 or 12 o'clock, and perhaps a little later; Long had on him three Colt's pistols when found, each shoots six times, but one had one barrel of it discharged; I arrested Long; he said, at the time of his arrest, that is, the first word was, " do you want this horse," or he might have said, " are you hunting me?" I took the pistols and carried them to town; handing Long the pistol with an empty barrel, I asked him if it was the one with which he killed deceased, and he said it was; I am a practising physician; said shot killed deceased; pistols generally sell from $15 00 to $18 00; I never saw Long and Duff in town except on the day of this killing. Carter's quarter is in the direction of deceased's house, but that is not the best road; Long was drinking on the day of said killing; it was up in the day sometime when deceased was killed, and it was one or two o'clock when Long was seen drinking.

The defendant's attorneys introduced no testimony. After argument they requested the Court to charge the jury as follows:

1st. " The jury are the judges of the law and the facts, and are bound, under your oaths as jurors in this case, to decide the law according to your own opinion of the law; they may differ from the Court in its charge to them as to the law. If you conscientiously differ with the Court as to the law, and fail to carry out that difference, you would be guilty of perjury."

2d. " If there is a reasonable doubt in the minds of the jury, from any cause, as to the guilt of the prisoner under the charge of murder, then the jury can not find the prisoner guilty of that charge; that the jury are there to consider as to the offense of manslaughter, and if then should be a reasonable doubt in the minds of the jury, from any cause, then the jury can not find the defendant guilty of man-

slaughter; you should be governed by this rule in the investigation of the several grades of manslaughter, and if reasonable doubts should go through the case, on each grade of homicide, then you should acquit the prisoner."

3d. "If the jury believe that the prisoner was, at the time of the commission of the act, surrounded by such circumstances as would excite the fears of a reasonable man, that the deceased, or those who were approaching him, intended to commit a personal injury upon him amounting to a felony, then the killing must be justifiable homicide; that is the law; whether deceased really intended or not to injure the prisoner, the law does not look alone to deceased's intention, but to the circumstances which would cause a reasonable man to act."

What the 4th request was, does not appear by the record.

5th. "Mental alienation, from any cause whatever, at the time the deed was done, to the extent that the accused did not know what he was doing, will rebut the presumption of malice arising from the apparent recklessness of his (defendant's) conduct so as to reduce the offence from murder to manslaughter."

6th. "That while drunkenness is no excuse for crime, yet you must consider of it, as a means of coming to a conclusion in arriving at the intention of the accused, and his state of mind at the time, so as to show the absence of malice, and the apparent recklessness of his conduct might be so far excused as to reduce the offence to manslaughter."

After giving in charge all the grades of homicide, the Judge proceeded to charge the jury as follows: "If you believe, from the evidence in this case, that Long shot Echols through the head, and the evidence has not disclosed circumstances of paliation, the Court charges you that this is such an external circumstance, capable of proof, as may establish express malice, and if this act killed Echols, and the proof does not show it to be voluntary manslaughter or involuntary manslaughter, or justifiable homicide, it is murder, and it is your duty so to find.

When a homicide is clearly proved, malice is presumed

by the law, unless the testimony discloses circumstances and rebuts that presumption. If the jury believe that Long shot and killed Echols intentionally, he is presumed to intend the natural and proximate consequences of his own acts, and if it is not shown that Echols, or those with Echols and co-operating with him, assaulted Long or attempted to commit a violent, personal injury to Long, or did some other act equivalent to these, it will be your duty to find Long guilty of murder.

Malice shall be implied wherever no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart. This law shows that when a person shoots into a crowd, or toward a person unknown to the slayer, and kills another in a reckless manner, and when the circumstances show a disregard of human life or human safety, that malice is implied. In this case, it may appear that both express and implied malice is shown. The Court has already charged you as to express malice. If the evidence shows that Echols had given Long no considerable provocation, and he was unknown to Long, and that Long wantonly shot and killed him, malice is implied, and the killing is murder, and the jury should so find."

He then gave in charge the first of said requests. He read the second to the jury, saying that he declined to charge it, and added that if they had reasonable doubts with the several grades of homicide, and those doubts arose from or grew out of the testimony in the case, the position taken was right; that the words "from any cause" were too sweeping, and should be understood thus: "from any cause shown by or originating from the testimony in the case."

He declined charging the third request. Reading it to the jury, he said: "Unless deceased, and those with deceased and co-operating with him, intended or showed to prisoner that they intended to commit a violent personal injury on prisoner, amounting to a felony, the prisoner would not be justifiable in killing deceased. If A and B were approaching C, and exhibiting evidence of felonious injuries on C, it would not justify C in killing D, who has nothing

to do with A and B. What a stranger or third party did or proposed to do could not justify Long in killing Echols, unless Long had been given reason to infer that Echols intended to harm him seriously."

The fourth request he refused. Reading it to the jury, he said : "With regard to this charge, unless the evidence shows that the accused had good reason to believe that Echols, or some one acting in conjunction with him, were about to commit some injury upon the accused, the accused had no right to shoot deceased, and unless Echols had something to do with the circumstances surrounding prisoner, or prisoner had good reason for believing that Echols was engaged in them, the circumstances surrounding prisoner could not justify him in shooting Echols.

He refused to give in charge the fifth and sixth requests, but with reference to drunkenness, charged as follows :

"Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud or artifice or contrivance of other person or persons, for the purpose of having the crime committed, and then the person or persons so causing said drunkenness, for such malignant purpose, shall be considered a principal, and suffer the same punishment as would have been inflicted upon the person committing the offence if he, she, or they, had been possessed of sound reason and discretion.

From the law it will be found that drunkenness is no excuse for the killing of Echols, unless the evidence discloses the fact that the drunkenness was procured by the fraud of some person to procure the commission of the offence. Evidence of drunkenness may be given in to rebut the presumption of malice where provocation is shown on the part of the deceased, to show that the accused might by some provocation have been more easily excited when drunk than if he had been sober, and thus made subservient to irresistible passion, but if the evidence does not show that deceased provoked defendant, or did something to excite his animosity, if it were in proof that he was drunk, it could not inure to his advantage.

If your minds rest satisfied beyond a reasonable doubt that the accused did shoot and kill A. B. Echols, the deceased, with malice aforethought, either express or implied, it is your duty to find the defendant guilty. If you believe that there are palliating circumstances, and that there is a good legal reason for so finding, you may recommend that he be confined in the penitentiary for life; it requires your recommendation to have his punishment reduced from death to imprisonment for life."

The balance of the charge was only directory as to the form of their verdict.

The defendant was found guilty of murder. His attorneys moved for a new trial upon the following grounds:

1st. The refusal of the continuance upon the affidavit of the 28th of September, 1868, when the case was last called for trial.

2d. Because the Court required the defendant to state in his affidavit of 24th of September, 1868, what he expected to prove by each of his witnesses.

3d. Because the Court erred in requiring the defendant to plead not guilty when he proposed to plead insanity, and required both pleas filed simultaneously.

4th. Because the Court erred in refusing the application for continuance, on the ground of insanity, under the affidavits of 29th, September, 1868, aforesaid.

5th. Because the Court erred in ordering the issue of insanity withdrawn from the jury when he did.

5th. Because the Court erred in pressing defendant to trial without calling on him to plead "guilty or not guilty."

7th. Because the Court erred in not quashing the indictment for the reason stated, and at the time when the motion was made.

8th. Because the charge was not sustained by the law or facts of the case.

9th. Because the Court erred in refusing to charge as requested, and in qualifying the requests as he did.

And last. Because the verdict was contrary to the law and evidence.

The Court refused a new trial, and this is assigned as error upon the grounds aforesaid.

JESSE GLENN, for plaintiff in error.

W. H. DABNEY, (representing the Solicitor General,) for defendant in error.

McCAY, J.

This killing took place in April, 1866, in Gordon county. The venue was regularly changed at April Term, 1868, by order of the Court, on motion of defendant.

When the case was called at the place of the new venue, at November Term, 1868, the defendant moved to continue, on his own affidavit, that he only knew, a few days before, that the venue had been changed; that the attorney on whom he relied was not present, and he supposed *he* did not know of the change of venue; that there were various witnesses absent, who were present at the killing, by whom he could prove that, at the time of the killing, deceased was approaching him in a threatening manner, etc. This showing the Judge overruled, because it failed to state what facts he could prove by each witness, and because the affidavit itself only stated positively that *three* of the witnesses mentioned were present at the killing, and the Court knew, from *its own eyesight*, that one of those witnesses was present then in Court, and that three other persons, whether among those named or not did not appear, who were also present at the killing, were also present in Court. The fact was also apparent, that the prisoner had seen and conversed with none of the witnesses of whose absence he complained, and only knew of their acquaintance with the facts by his information from others that they were present. Yet four of those present at the killing were also present in open Court at the trial.

There was nothing in the first motion about insanity. The motion to continue was overruled and the case set down for trial.

When the hour arrived the defendant, with his plea of not guilty, filed a plea of insanity, and made another motion to continue, on the ground of absent witnesses, to sustain his plea of insanity. This the Court overruled, on the ground, that this ground of continuance ought to have been made with the other.

When the prisoner was arraigned, the Court required him to plead guilty or not guilty. This he objected to, but proposed to plead insanity. The Court permitted this plea, but required also the plea of guilty or not guilty.

On the trial before the special jury of the plea of insanity, no evidence was introduced on either side, and the Court withdrew the plea and discharged the jury.

After the case had gone to the traverse jury, the prisoner's counsel objected, that the indictment did not state the residence of the prisoner.

The charges of the Court and failure, are fully stated by the Reporter.

1. Section 4536 of our Code provides, that all exceptions which go merely to the form of an indictment, shall be made before trial. The *residence* of the defendant is not a material allegation. Its statement is mere matter of form. In practice, it is never proven before the jury. If omitted, and objection is made, it is too late to make it after arraignment and plea. Code, sec. 4536.

2. In looking through the record in this case, whilst we cannot affirmatively say we approve of the refusal of the Court to grant the motion of the defendant to continue, yet, on the other hand, we are unable to say that we disapprove it. The Circuit Judge has large discretion in continuances. The application is, to a great extent *ex parte*, at least it is the practice, to hear no counter showing, and there are often circumstances, in the actual surroundings, of which none but the Court below can be a proper judge. This Court will not interfere, unless the Judge abuses the discretion reposed in him by law. It is only then he is in error. Continuances are in the wise discretion of the *Superior* Court, not of this Court, and it is only when the discretion of the Circuit

Long *vs.* The State of Georgia.

Judge is abused—is unwise—that this Court interposes to control it.

If it be true that the defendant did not know the case was removed to Bartow county until the brief period before the trial, which he fixes, we confess that it would seem he had not time to prepare his case.   But here was the record staring him and the Court in the face that the case had been moved at his own instance by an order, at April Term, 1868, of Gordon Court to Bartow county.   November Term, 1868, of Bartow Superior Court, gave over six months time for preparation.   It was his business to know, and as he makes no explanation of his ignorance, we take it for granted that it was inexcusable.   If a man shut his eyes to facts patent and plain, he must take the consequences.

3. That the defendant was in jail in a distant county, is no legal excuse for want of preparation.   If this is an excuse he can never be tried at all.   The State keeps him secure. That it has a right to do, but we all know if he uses proper diligence he can have his case prepared, even though in jail. He knows his witnesses, and has the State's officers and *sub-pœnas* at his command.   *Revel vs. The State,* 26th *Ga.,* 278.

4. No excuse is given for the absence of counsel.   It would be trifling with public justice to hold back her hand because the accused's lawyer saw fit to absent himself from the Court.   16th *Ga. R.,* 526.

5. Whilst we recognize the soundness of the argument, that justice is the ultimate end of the rules of proceedings, yet it is true, that to a large extent, rules of proceedings are important towards the attainment of justice.   Even in a case of life and death the Court must proceed by rule, and not in confusion.   A pertinacious and suggestive advocate can have any number of after-thoughts, and suggest indefinitely new views of motions made and decided, until the time fixed by law for the term is exhausted.   The rule of Court is imperative.   "All grounds of motion for non-suit, in arrest of judgment, and for *continuance,* etc., must be urged and insisted on at once.   And after a decision upon one or more grounds, no others afterwards urged will be heard by the

Court." 53 Com. L. Rules. In practice, this rule is often, *in the discretion of the Court*, relaxed, but we are strongly inclined to think that more business would be done, and far more wisely, if it were strictly adhered to.

6. As we have said, a motion to continue is in effect *ex parte*, and the Court below not only has a right, but it is his duty to scan closely the very words of the affidavit, prepared carefully, as it is, by counsel, and to judge of it in the light of all the circumstances. Here was a most atrocious crime, a good citizen, shot down wilfully, without the least provocation, at his own door, by a drunken outlaw. Here were present in Court four persons, at least, who stood by and saw it done. And yet, because the prisoner swears that there were others present and saw the deed done, though he has not conversed with them and can not say what they will testify, except from his own knowledge of what took place—he at the same time setting up insanity and mental aberration at the time—the Court is charged to have erred in refusing to continue.

We think it will be pushing caution too far to overrule the Judge in such a case.

We cannot, in looking through this record, escape the conclusion, that this motion to continue was made as an act of finesse, and not for the purpose of getting the truth. We repeat, that the refusal of a continuance is in the sound, legal discretion of the Superior Court, and not of this Court, and, to make the refusal of the Circuit Judge to grant a continuance a ground of error, it must be made apparent, affirmatively, that the Court below has abused his discretion. We do not mean that he has acted wickedly or with unfairness, though, as a matter of course, that would be abuse, but that he has *clearly* erred—done the party, perhaps inadvertently, injustice.

This is not a Court of appeals, but of errors, and on matters left by law in the sound discretion of the Court below, it is not enough, simply, that this Court would, so far as the case is before it, have done otherwise, but it must affirmatively appear, that on the whole case, the Judge was clearly

Long vs. The State of Georgia.

wrong, before this Court has jurisdiction of an error of discretion. *Roberts vs. The State*, 14 *Ga. R.*, 6 ; *Revel vs. The State*, 26 *Ga. R.*, 493 ; 27 *Ga. R.*, 411.

7. If the prisoner was insane at the commission of the act, he is not guilty; he may prove his condition under that plea. It is, in all crimes, one of the ingredients of the offence that there shall be a joint operation of act and intent, and an insane person cannot, in a legal sense, have any intent. Indeed, in murder, soundness of mind, in the perpetration of the act, is a part of the definition of the crime. We can see no necessity, in such a case, for the special provision for a "plea of insanity" and its trial by a "special jury." The section of the Code, by virtue of which it is contended that even insanity at the time of the act is to be tried separately from the plea of not guilty, and by a special jury, is as follows :

"Whenever the plea of insanity is filed, it shall be the duty of the Court to cause the issue on that plea to be first tried by a special jury, and if found to be true, the Court shall order the defendant to be delivered to *the superintendent of the asylum, there* to remain until discharged by the General Assembly. "

It seems to us both absurd and cruel to send a *sane* man to the *lunatic asylum,* and we can not think such was the intent of the law makers.

There may perhaps be a propriety in so confining one subject to fits of insanity. Such a person may fairly be considered dangerous to the community, but that one perfectly sane at the time of the trial, free from the insanity which has once made him irresponsible for his acts, should be condemned by the law to live among madmen, is to us so preposterous, that we can not think such was the intention of the Legislature.

It is true there is other sections of the Code which seems to imply that this section is to be so understood, (section 4579,) but it is hardly fair to insist that every section of so large a body of laws shall be absolutely harmonious.

We are inclined to think the case of a man who is subject

to frequent fits of insanity, and in one of them has committed a crime, (and in fact such cases are those with which, in practice, we most frequently have to deal,) might come under the law. Such a person may have lucid intervals, but not unfairly may be called insane, and in such cases it may be both mercy to him, and policy in the public, to confine him, but unless it be pleaded that he is insane, at the trial, or he be one of the unfortunate class alluded to, subject to fits of insanity, so as to constitute that condition a characteristic one, we are of the opinion that his plea of insanity is part of his plea of "not guilty," and that he is not subject, if his plea of insanity be sustained, to be consigned to the lunatic asylum. He may, and must prove the facts on his trial, and if they show him to have been insane at the time of the act, he is "not guilty."

We do not decide that if his plea show not only that he was insane at the time, but that he is subject to fits of insanity, so that he may not inaptly be called an insane man, he is not entitled to the privilege of the special plea and special trial provided for by this section of the Code. This is not such a case.

That the defendant was insane at the time of the act done, is, in fact, but a branch of the plea of not guilty. If it be true, he has committed no offence, and we see no hardship on him that the Judge, who had pursued the express language of the Code, required him to plead guilty or not guilty on his arraignment. If he saw fit, as one shape of his plea of not guilty, to plead specially his insanity, which he was not *bound* to do, his plea of not guilty did not interfere. When neither party introduced evidence under the plea, it was right in the Court to withdraw it, and discharge the special jury.

8. The Judge was asked to charge the jury that, if from *any cause* they had doubts of the guilt of the prisoner they must acquit him. The Judge refused so to do, and charged that if they had any reasonable doubts which arose from or grew out of the testimony in the case, they must acquit, saying to the jury that doubts "*from any cause*" were too sweeping. We think the Judge was right. The doubts

Long *vs.* The State of Georgia.

must be doubts pertinent to the matter in issue, arising out of the evidence, or want of evidence, and not from *any cause.* Juries, in their judgments in criminal cases, occupy the same position as other searchers after truth, with but one exception, the presumption is in favor of innocence, and the guilt of the defendant must not be doubtful. But the rules of belief and the grounds of confidence are the same as in other cases, and the principles of common sense are just as controlling as in other cases. No mawkish sensibility, no skeptical niceties, are to control them, but the plain rules of common sense and common experience.

9. Section 4257 of the Code prescribes that "the penalty for murder shall be death, but may be confinement in the penitentiary for life in the following cases.

"1st. By sentence of the presiding Judge, if the conviction is founded solely on circumstantial testimony, or if the jury trying the traverse shall so recommend. In the former case it is discretionary with the Judge, in the latter it is not."

"2d. By Act of the General Assembly."

In the construction of the Code, the object of the Legislature is to be kept in view. Without doubt that object was not to make new laws, but to codify and make plain the laws already in existence. It is true that in many instances the codifiers have altered the law, and until the Convention of 1865 adopted the Code bodily, there was among the profession some doubts as to the validity of these alterations. Keeping, then, in view the object in the appointment of the compilers, it is but a fair rule of construction to presume that they did not alter the law, except where they have plainly done so, and only so far as they have plainly done so.

The law, before the Code, made the punishment of murder death, except in the single case of a conviction founded solely on circumstantial evidence. In that case, in consequence of the extreme liability of such testimony to deceive, the Judge was authorized, in his discretion, to sentence the convicted person to imprisonment for life.

This was in the descretion of the Judge; the recommendation of the jury had nothing to do with it, except by its

moral influence.   And this was felt to be an evil.   Judges sometimes inflicted the death penalty, even in cases of circumstantial testimony.   Public opinion has always, in this State, been against the death penalty, in cases of this kind, but in other cases of plain, direct evidence, that mawkish mercy, which hesitates to deal out death to the guilty man-slayer, has never had, in this State, much currency.   We are inclined against a construction, which assumes the codifiers, without any public demand for the alteration, to have intended to introduce so vital a change into our criminal law.

We do not, therefore, accede to the construction which the Court below has put upon the Code, to-wit:  That in all cases of murder, it is the right of the jury, if they have any good reason, to authoritatively recommend, in lieu of the death penalty, imprisonment for life.   We think the old law, and especially the retaining in the section, the case of "conviction, on circumstantial evidence," are a key to the proper construction of this section of the Code.   The death penalty is prescribed, except in cases of circumstantial evidence.

As we understand the language of the Code, it does not authorize the death penalty to be commuted in all cases by the mandatory recommendation of the jury.   The punishment of murder is still death by the law, except in cases of circumstantial evidence.   If the conviction is founded solely on such evidence the jury may recommend such commutation, and their recommendation is mandatory and final.   If they fail so to recommend, it is still in the discretion of the Judge so to commute.   But neither the Judge nor the jury have power to commute the death penalty to imprisonment for life, except in cases where the conviction is founded solely on circumstantial testimony.   To give the words of the Code any other meaning would, it seems to us, be to stretch the language of the codifiers contrary to the intent of their appointment.   It will be noticed, too, that unless the clause " if the jury so recommend," is confined to the case of conviction founded on circumstantial evidence, we will be driven to the absurd result that in such cases the fate of the prisoner is wholly

with the Judge.  In the former case, it is said, it is discretionry with the Judge, in the latter it is not.  What is the former case?  "If the conviction is founded solely on circumstantial testimony."  It seems to us that the language of the law can be more exactly conformed to by understanding that it was simply the intent to give the jury a mandatory power to commute, in case of a conviction founded solely on circumstantial testimony, and if they failed to exercise that power, to give the same discretion to the Court.  Otherwise, also, we would be driven to the remarkable conclusion that the jury might, *in all cases*, authoritatively recommend the commutation, while the discretion of the Judge could only be exercised in the single case of a conviction founded solely on circumstantial cevidence.  The division of the section immediately after the words "following cases" into paragraphs, marked 1 and 2, in the first of which is included as one "case" the language we have quoted, and in the 2d, the words "By Act of the Legislature," indicates that the whole section included in paragraph 1 is a *case* in the sense intended, by the words *following cases*, in the second line.

· The Judge, in this case, gave the prisoner a more favorable charge in this point than, as we have held, he was entitled to.  He told them that they might, if they could find any palliating circumstances, recommend the commutation.  If the qualification be wrong, it did the prisoner no harm, as such recommendation was not in the power of the jury.  This was a plain case of murder—wicked, reckless, causeless murder—and the proof positive and direct. If ever a jury was right this one was.  Mercy, in such a case, would be cruelty to society.  Violence and homicide have too long been the reproach of our State.  And whilst we would always insist on a strict adherence to the law, yet we have no fancy for refinements, to clutch from his merited fate one so lost to all care for human life, as is exhibited by the facts of this record.  Too many crimes remain, in this State, unpunished; too many criminals go unpunished of justice, until our brother's blood cries out, as did Abel's.  Hu-

man life, peaceful human life, needs for its protection, that the laws against murder shall be enforced, and we can not, for slight causes, delay the march of punitive justice.

Judgment affirmed.