## GUITEAU'S CASE.

Charge of Judge Cox, of the District of Columbia, delivered on the twenty-fifth day of January, 1882, in the celebrated case of Charles J. Guiteau for the assassination of James A. Garfield, late president of the United States, on the second day of July, 1881. Plea of insanity. Verdict: Guilty.

THE COURT. *Gentlemen of the Petit Jury:*

The constitution of the United States provides that—

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed; * * * to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defence."

These provisions are deemed the indispensable safeguards of life and liberty. They are intended for the protection of the innocent from injustice and oppression. It is only by their faithful observance that guilt or innocence can be fairly ascertained.

Every accused person is presumed innocent until the accusation be proved, and until such proof no court dare to prejudge his cause or withhold from him the protection of this fundamental law.

With what difficulty and trial of patience this law has been administered in the present case, you have been daily witnesses.

After all, however, it is our consolation that not one of these sacred guaranties has been violated in the person of the accused.

If he be guilty, no man deserves their protection less than he does. If he be innocent, no man needs their protection more, and no man's case more clearly proves their beneficence and justice.

At length the long chapter of proof is ended; the task of the advocate is done; and the duty now rests with you of determining, with such aid as I can afford you, the issue between public justice and the prisoner at the bar.

No one can feel more keenly than I do the grave responsibility of my duty; and I feel that I can only discharge it by a close adherence to the law as it has been laid down by its highest authorized expounders.

Before proceeding, I wish to interject here a remark upon an epi-

sode in the trial pending the last argument. The prisoner has taken repeated occasions to proclaim that public opinion, as evidenced by the press and by his correspondence, is in his favor. As you well know, these declarations could not have been prevented except by resorting to the process of gagging him. Any suggestion that you could be influenced by this lawless babble of the prisoner, would have seemed to me simply absurd, and I should have felt that I had almost insulted your intelligence if I had warned you not to regard it. The counsel for the prosecution have been rebuked for allowing these declarations to go to you without contradiction, and in the course of the final argument they felt it necessary to interpose a contradiction to these declarations of the prisoner, and the latter's counsel excepted to the form in which the contradiction was made. For the sole purpose of purging this record of any apparently objectionable matter, I would simply say, here, that nothing that has been said in reference to public sentiment or newspaper opinion, on either side, is to be regarded by you, although I really feel that such an admonition from me is totally unnecessary.

This indictment charges the defendant with having murdered James A. Garfield.

It becomes my duty, in the first place, to explain to you the nature of the crime charged.

With us, murder is committed where a person of sound memory and discretion unlawfully kills a reasonable creature in being, and in the peace of the United States, with malice aforethought.

It must of course be proved, first, that the death was caused by the act of the accused.

It must be further shown that it was caused with malice aforethought; but this does not mean that the government must prove any special ill-will, hatred, or grudge, on the part of the prisoner, towards the deceased. Whenever a homicide is shown to have been committed without lawful authority and with deliberate intent, it is sufficiently proved to have been done with malice aforethought. And this evidence is not answered and malice is not disproved, by showing that the accused had no personal ill-will against the deceased, but killed him from some other motive, as for purpose of robbery, or by mistaking him for another, or, as alleged in this case, to produce a public benefit.

If it could be shown that the killing occurred in the heat of passion and on sudden quarrel, and under provocation from the deceased, then it would appear that there was no premeditated intent, and con-

sequently no malice aforethought; and this would reduce the crime to manslaughter. But it is hardly necessary to say that there is nothing of that kind in the present case. You will probably see that either the defendant is guilty of murder or he is innocent.

But, in order to constitute the crime of murder, the assassin must have a responsibly sane mind. The technical term, "sound memory and discretion," in the old common-law definition of murder, means this. An irresponsibly insane man can no more commit murder than a sane man can do so without killing. His condition of mind cannot be separated from the act. If he is laboring under disease of his mental faculties—if that is a proper expression—to such an extent that he does not know what he is doing, or does not know that it is wrong, then he is wanting in that sound memory and discretion which make a part of the definition of murder.

In the next place, I instruct you that every defendant is presumed innocent until the accusation against him is established by proof.

In the next place, notwithstanding this presumption of innocence, it is equally true that a defendant is presumed to be sane and have been so at the time when the crime charged against him was committed; that is to say, the government is not bound, as a part of its proofs, to show, affirmatively, that the defendant was sane. As insanity is the exception, and most men are sane, the law presumes the latter condition of everybody until some reason is shown to believe the contrary. The burden is therefore on the defendant, who sets up insanity as an excuse for crime, to bring forward his proofs, in the first instance, to show that that presumption is a mistake as far as it relates to him.

The crime, then, involves three elements, viz.: The killing, malice, and a responsible mind in the murderer.

But after all the evidence is in, if the jury, while bearing in mind both these presumptions that I have mentioned,—*i. e.*, that the defendant is innocent till he is proved guilty, and that he is and was sane, unless evidence to the contrary appears,—and considering the whole evidence in the case, still entertain what is called a reasonable doubt, on any ground, (either as to the killing, or the responsible condition of mind,) whether he is guilty of the crime of murder, as it has been explained and defined, then the rule is that the defendant is entitled to the benefit of that doubt and to an acquittal.

But here it becomes important to explain to you, in the best way that I can, what is a reasonable doubt. I can hardly venture to give

you an exact definition of the terms, for I do not know of any successful attempt to do so.

As to questions relating to human affairs, a knowledge of which is derived from testimony, it is impossible to have the same kind of certainty which is created by scientific demonstration. The only certainty you can have is a moral certainty, which depends upon the confidence you have in the integrity of witnesses, and their capacity to know the truth.

If, for example, facts not improbable are attested by numerous witnesses who are credible, consistent, and uncontradicted, and who had every opportunity of knowing the truth, a reasonable or moral certainty would be inspired by their testimony. In such case, a doubt would be unreasonable, or imaginary, or speculative, which the books say it ought not to be. And it is not a doubt whether the party may not *possibly* be innocent in the face of strong proof of his guilt, but a sincere doubt whether he has been proved guilty, that is called reasonable.

And even where the testimony is contradictory, so much more credit may be due to one side than the other, that the same result will be produced.

On the other hand, the opposing proofs may be so nearly balanced that the jury may justly doubt on which side lies the truth, and, in such case, the accused party is entitled to the benefit of the doubt.

As certainty advances, doubt recedes. If one is reasonably certain, he cannot, at the same time, be reasonably doubtful, *i. e.*, have a reasonable doubt, of a fact. All that a jury can be expected to do is to be reasonably or morally certain of the fact which they declare by their verdict.

As Chief Justice Shaw says, in *Com.* v. *Webster*, 5 Cush. 320:

"For it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it."

With regard to the evidence in this case, very little comment is required from the court, except upon one question, the others being hardly matters of dispute.

That the defendant fired at and shot the deceased president is abundantly proved, if you believe the testimony.

That the wound caused the death has been testified to by the surgeons most competent to speak on that subject, and they are uncontradicted.

That the homicide was committed with malice aforethought, if the defendant was capable of criminal intent and malice, can hardly be gainsaid if you will bear in mind what I have already said. It is not necessary to prove that any special and express hatred or malice was entertained by the accused towards the deceased. It is sufficient to prove that the act was done with deliberate intent, as distinct from an act done under the sudden impulse of passion, and in the heat of blood, and without previous malice.

Evidence has been exhibited to you tending to show that the defendant, in his own handwriting, admitted that he had conceived the idea of removing the president, as he calls it, some six weeks before the shooting, and had deliberated upon it, and come to a determination to do it, and that about two weeks before he accomplished it, he stationed himself for the purpose, but some relentings delayed the attempt. His preparation for it by the purchase of the pistol has been detailed to you. All these facts, if believed by you, come up to the full measure of proof required to establish what the law denominates *malice aforethought*.

And thus, I apprehend, that you will have little difficulty in reaching a conclusion as to all the elements that make up the crime charged in the indictment, unless it be the one of "sound memory and discretion," as it is called, which is only a technical expression for a sound mind. We now approach the difficult question in this case.

I have said that a man who is insane, in a sense that makes him irresponsible, cannot commit a crime.

The defence of insanity has been so abused as to be brought into great discredit. It has been the last resort in cases of unquestionable guilt, and has been the excuse to juries for acquittal, when their own and the public sympathy have been with the accused, and especially when the provocation to homicide has excused it according to public sentiment, but not according to law. For these reasons, it is viewed with suspicion and disfavor, whenever public sentiment is hostile to the accused. Nevertheless, if insanity be established to the degree that has been already, in part, and will hereafter further be explained, it is a perfect defence to an indictment for murder, and must be allowed full weight.

Now, it is first to be observed that we are not troubled in this case with any question about what may be called *total* insanity, such as

raving mania, or absolute imbecility, in which all exercise of reason is wanting, and there is no recognition of persons or things, or their relations.

But there is a debatable border-line between the sane and the insane, and there is often great difficulty in determining on which side of it a party is to be placed. There are cases in which a man's mental faculties generally seem to be in full vigor, but on some one subject he seems to be deranged. He is possessed, perhaps, with a belief which every one recognizes as absurd, which he has not reasoned himself into, and cannot be reasoned out of, which we call an *insane delusion,* or he has, in addition, some morbid propensity, seemingly in harsh discord with the rest of his intellectual and moral nature.

These are cases of what, for want of a better term, is called partial insanity.

Sometimes its existence, and at other times its limits, are doubtful and undefinable. And it is in these cases that the difficulty arises of determining whether the patient has passed the line of moral or legal accountability for his actions.

You must bear in mind that a man does not become irresponsible by the mere fact of being partially insane. Such a man does not take leave of his passions by becoming insane, and may retain as much control over them as in health. He may commit offences, too, with which his infirmity has nothing to do. He may be sane as to his crime, understand its nature, and be governed by the same motives in regard to it as other people; while on some other subject, having no relation to it whatever, he may be subject to some delusion. In a reported case, a defendant was convicted of cheating by false pretences, but was not saved from punishment by his insane delusion that he was the lawful son of a well-known prince. The first thing, therefore, to be impressed upon you is, that wherever this partial insanity *is relied on as a defence, it must appear that the crime charged was the product of the delusion,* or other morbid condition, and connected with it as effect with cause, and not the result of sane reasoning or natural motives, which the party may be capable of, notwithstanding his circumscribed disorder. The importance of this will be appreciated by you further on.

But, assuming that the infirmity of mind has had a direct influence in the production of crime, the difficulty is to fix the degree and character of the disorder which, in such case, will create irresponsibility in law. The outgivings of the judicial mind on this subject have not

always been entirely satisfactory or in harmony with the conclusions of medical science. Courts have, in former times, undertaken to lay down a law of insanity without reference to and in ignorance of the medical aspects of the subject, when it could only be properly dealt with through a concurrent and harmonious treatment by the two sciences of law and medicine. They have, therefore, adopted and again discarded one theory after another in the effort to find some common ground where a due regard for the security of society and humanity for the afflicted may meet. It will be my effort to give you the results most commonly accepted by the courts.

It may be well to say a word as to the evidence by which courts and juries are guided in this difficult and delicate inquiry.

That subtle essence which we call "mind" defies, of course, ocular inspection. It can only be known by its outward manifestations, and they are found in the language and conduct of the man. By these his thoughts and emotions are read, and according as they conform to the practice of people of sound mind, who form the large majority of mankind, or contrast harshly with it, we form our judgment as to his soundness of mind. For this reason evidence is admissible to show conduct and language at different times and on different occasions, which indicate to the general mind some morbid condition of the intellectual powers; and the more extended the view of the person's life the safer is the judgment formed of him. Everything relating to his physical and mental history is relevant, because any conclusion as to his sanity must often rest upon a large number of facts. As a part of the language and conduct, letters spontaneously written afford one of the best indications of mental condition.

Evidence as to insanity in the parents and immediate relatives is also pertinent. It is never allowed to infer insanity in the accused from the mere fact of its existence in the ancestors. But when testimony is given directly tending to prove insane conduct on the part of the accused, this kind of proof is admissible as corroborative of the other. And therefore it is that the defence have been allowed to introduce evidence to you covering the whole life of the accused, and reaching to his family antecedents.

In a case so full of detail as this I shall deem it my duty to you to assist you in weighing the evidence by calling your attention to particular parts of it. But I wish you distinctly to understand that it is your province, and not mine, to decide upon the facts; and if I, at any time, seem to express or intimate an opinion on them, which I

do not design to do, it will not be binding on you, but you must draw your own conclusions from the evidence.

The instructions that have been given you import, in substance, that the true test of criminal responsibility, where the defence of insanity is interposed, is whether the accused had sufficient use of his reason to understand the nature of the act with which he is charged, and to understand that it was wrong for him to commit it; that if this was the fact he is criminally responsible for it, whatever peculiarities may be shown about him in other respects; whereas, if his reason was so defective, in consequence of mental disorder, generally supposed to be caused by brain disease, that he could not understand what he was doing, or that what he was doing was wrong, he ought to be treated as an irresponsible person.

Now, as the law assumes every one at the outset to be sane and responsible, the question is, what is there in this case to show the contrary as to this defendant?

A jury is not warranted in inferring that a man is insane from the mere fact of his committing a crime, or from the enormity of the crime, or from the *mere apparent* absence of adequate motive for it, for the law assumes that there is a bad motive—that it is prompted by malice—if nothing else appears.

Perhaps the easiest way for you to examine into this subject is, *first*, to satisfy yourselves about the condition of the prisoner's mind for a considerable period of time before any conception of the assassination entered it, and at the present time, and then to consider what evidence exists as to a different condition at the time of the act charged.

I shall not spend any time on the first question, because to examine it at all would require a review of evidence relating to over 20 years of the defendant's life, and this has been so exhaustively discussed by counsel that anything I could say would be a wearisome repetition. Suffice it to say, that, on one side, this evidence is supposed to show a chronic condition of insanity for many years before the assassination; and, on the other, to show an exceptionally quick intellect and decided power of discrimination.

You must draw your conclusions from the evidence.

Was his ordinary, permanent, chronic condition of mind such, in consequence of disease, that he was unable to understand the nature of his actions, or to distinguish between right and wrong in his conduct? Was he subject to insane delusions that destroyed his power

of so distinguishing? And did this continue down to and embrace the act for which he is tried? If so, he was simply an irresponsible lunatic.

Or, on the other hand, had he the ordinary intelligence of sane people, so that he could distinguish between right and wrong, as to his own actions? If another person had committed the assassination, would he have appreciated the wickedness of it? If he had had no special access of insanity impelling him to it, as he claims was the case, would he have understood the character of such an act and its wrongfulness if another person had suggested it to him? If you can answer these questions in your own minds it may aid you towards a conclusion as to the normal or ordinary condition of the prisoner's mind before he thought of this act; and if you are satisfied that his chronic or permanent condition was that of sanity, at least so far that he knew the character of his own actions, and whether they were right or wrong, and was not under any permanent insane delusions which destroyed his power of discriminating between right and wrong as to them, then the only inquiry remaining is whether there was any special insanity connected with this crime; and what I shall further say will be on the assumption that you find his general condition to have been that of sanity to the extent I have mentioned.

On this assumption it will be seen that the reliance of the defence is on the existence of an insane delusion in the prisoner's mind which so perverted his reason as to incapacitate him from perceiving the difference between right and wrong as to this particular act.

As a part of the history of judicial sentiment on this subject, and by way of illustrating the relation between insane delusions and responsibility, I will refer to a celebrated case in English history already freely commented on in argument. Nearly 40 years ago one MacNaghten was tried in England for killing a Mr. Drummond, private secretary of Sir Robert Peel, mistaking him for the premier himself. He was acquitted on the ground of insanity, and his acquittal caused so much excitement that the house of lords addressed certain questions to the judges of the superior courts of England in regard to the law of insanity in certain cases, and their answers have been since regarded as settling the law on this subject in England, and, with some qualification, have been approved in the courts of this country. One of the questions was:

"If a person, under an insane delusion as to the existing facts, commits an offence in consequence thereof, is he thereby excused?"

To which it was answered, that—

"In case he labors under a partial delusion only, and is not in other respects insane, he must be considered in the same situation, as to responsibility, as if the facts with regard to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting his life, and he kills that man, as he supposes, *in self-defence*, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him *in revenge* for such supposed injury, he would be liable to punishment."

This, you will understand, was because it was excusable to kill in self-defence, but not to kill in revenge for an injury.

This has been in part recognized as law in this country.

Thus Chief Justice Shaw, of Massachusetts, in the case of *Com.* v. *Rogers*, 7 Metc. 500, says:

"Monomania may operate as an excuse for a criminal act" when the "delusion is such that the person under its influence has a real and firm belief of some fact, not true in itself, but which, if it were true, would excuse his act; as when the belief is that the party killed had an immediate design upon his life, and under that belief the insane man kills in supposed self-defence. A common instance is, where he fully believes that the act he is doing is done by the immediate command of God, and he acts under the delusive but sincere belief that what he is doing is by the command of a superior power, which supersedes all human laws and the laws of nature."

The cases I have referred to furnish an introduction to the subject of insane delusions, which plays an important part in this case, and demands careful consideration. We find it treated, to a limited extent, in judicial decisions, but learn more about it from works on medical jurisprudence and expert testimony. Sane people are said sometimes to have delusions, proceeding from temporary disorder and deception of the senses, and they entertain extreme opinions which are founded upon insufficient evidence, or result from ignorance, or they are speculations on matters beyond the scope of human knowledge; but they are always susceptible of being corrected and removed by evidence and argument.

But the *insane delusion*, according to all testimony, seems to be an unreasoning and incorrigible belief in the existence of facts which are either impossible absolutely, or, at least, impossible under the circumstances of the individual. A man, with no reason for it, believes that another is attempting his life, or that he himself is the owner of untold wealth, or that he has invented something which will revolutionize the world, or that he is president of the United States, or that he is God or Christ, or that he is dead, or that he is immortal, or

that he has a glass arm, or that he is pursued by enemies, or that he is inspired by God to do something.

In most cases, as I understand it, the fact believed is something affecting the senses. It may also concern the relations of the party with others. But generally the delusion centers around himself, his cares, sufferings, rights, and wrongs. It comes and goes independently of the exercise of will and reason, like the phantasms of dreams. It is, in fact, the waking dream of the insane, in which facts present themselves to the mind as real, just as objects do to the distempered vision in *delirium tremens*.

The important thing is that an insane delusion is never the result of reasoning and reflection. It is not generated by them, and it cannot be dispelled by them.

A man may reason himself, and be reasoned by others, into absurd opinions, and may be persuaded into impracticable schemes and vicious resolutions, but he cannot be reasoned or persuaded into insanity or insane delusions.

Whenever convictions are founded on evidence, on comparison of facts and opinions and arguments, they are not insane delusions.

The insane delusion does not relate to mere sentiments or theories or abstract questions in law, politics, or religion. All these are the subjects of *opinions*, which are beliefs founded on reasoning and reflection. These opinions are often absurd in the extreme. Men believe in animal magnetism, spiritualism, and other like matters, to a degree that seems unreason itself, to most other people. And there is no absurdity in relation to religious, political, and social questions that has not its sincere supporters.

These opinions result from naturally weak or ill-trained reasoning powers, hasty conclusions from insufficient *data*, ignorance of men and things, credulous dispositions, fraudulent imposture, and often from perverted moral sentiments. But still, they are *opinions*, founded upon some kind of evidence, and liable to be changed by better external evidence or sounder reasoning. But they are not insane delusions.

Let me illustrate further:

A man talks to you so strongly about his intercourse with departed spirits that you suspect insanity. You find, however, that he has witnessed singular manifestations, that his senses have been addressed by sights and sounds, which he has investigated, reflected on, and been unable to account for, except as supernatural. You see, at

once, that there is no insanity here; that his reason has drawn a conclusion from evidence.

The same man, on further investigation of the phenomena that staggered him, discovers that it is all an imposture and surrenders his belief.

Another man, whom you know to be an affectionate father, insists that the Almighty has appeared to him and commanded him to sacrifice his child. No reasoning has convinced him of his duty to do it, but the command is as real to him as my voice is now to you. No reasoning or remonstrance can shake his conviction or deter him from his purpose. This is an insane delusion, the coinage of a diseased brain, as seems to be generally supposed, which defies reason and ridicule, which palsies the reason, blindfolds the conscience, and throws into disorder all the springs of human action.

Before asking you to apply these considerations to the facts of this case let me premise one or two things.

The question for you to determine is, what was the condition of the prisoner's mind at the time when this tragedy was enacted? If he was sufficiently sane *then* to be responsible, it matters not what may have been his condition before or after. Still, evidence is properly admitted as to his previous and subsequent conditions, because it throws light, prospectively and retrospectively, upon his condition at the time. Inasmuch as these disorders are of gradual growth and indefinite continuance, if he is shown insane shortly before or after the commission of the crime, it is natural to *conjecture*, at least, that he was so at the time. But all the evidence must center around the time when the deed was done.

You have heard a good deal of evidence respecting the peculiarities of the prisoner through a long period of time before this occurrence, and it is claimed that he was, during all that time, subject to delusions calculated to disturb his reason and throw it from its balance. I only desire to say here that the only materiality of that evidence is in the probability it may afford of the defendant's liability to such disorder of the mind, and the corroboration it may yield to other evidence which may tend directly to show such disorder at the time of the commission of the crime.

A few words may assist you in applying to the evidence what I have thus stated.

You are to determine whether, at the time when the homicide was committed, the defendant was laboring under any insane delusion prompting and impelling him to the deed.

Very naturally you look, first, for any explanation of the act which may have been made by the defendant himself at the time or immediately before and after.

You have had laid before you, especially, several papers which were in his possession, and which purport to assign the motives for his deed.

In the address to the American people of June 16th, which seems most fully to set forth his views, he says:

"I conceived the idea of removing the president four weeks ago. Not a soul knew of my purpose. *I conceived the idea myself* and kept it to myself. I read the newspapers *carefully, for* and *against* the administration, and *gradually the conviction dawned on me that the president's removal was a political necessity*, because he proved a traitor to the men that made him, and thereby imperilled the life of the republic."

Again:

"Ingratitude is the basest of crimes. That the president, under the manipulation of his secretary of state, has been guilty of the basest ingratitude to the stalwarts, admits of no denial. The expressed purpose of the president has been to crush Gen. Grant and Senator Conkling, and thereby open the way for his renomination in 1884. In the president's madness he has wrecked the once grand old Republican party, *and for this he dies.*" * * *

Again:

"This is not murder. It is a political necessity. It will make my friend Arthur president, and save the republic," etc.

The other papers are of similar tenor, as I think you will find.

There is evidence that, when arrested, the prisoner refused to talk, l it said that the papers would explain all.

On the night of the assassination, according to the witness James J. Brooks, the prisoner said to him that he had thought over it and prayed over it for weeks, and the more he thought and prayed over it the more satisfied he was that he had to do this thing. He *had made up his mind that he had done it as a matter of duty;* * * * he made up his mind that they (the president and Mr. Blaine) were conspiring against the liberties of the people, and that the president must die.

This is all that the evidence shows as to the prisoner's utterances about the time of the shooting.

In addition to this you have the very important testimony of the witness Joseph S. Reynolds as to the prisoner's statements, oral and written, made about a fortnight after the shooting. If you credit this testimony you find him reiterating the statements contained in the

other papers, but, perhaps, with more emphasis and clearness. He is represented as saying *that the situation at Albany suggested the removal of the president,* and as the factional fight became more bitter, he became more decided. He knew that Arthur would become president, and that would help Conkling, etc. *If he had not seen that the president was doing a great wrong to the stalwarts, he would not have assassinated him.*

In the address to the American people, then written, he says:

"*I now wish to state distinctly why I attempted to remove the president.* I had read the newspapers *for and against* the administration, very carefully, for two months, before I conceived the idea of removing him. *Gradually, as the result of reading the newspapers,* the idea settled on me that if the president was removed it would unite the two factions of the republican party, and thereby save the government from going into the hands of the ex-rebels and their northern allies. *It was my own conception,* and, *whether right or wrong, I take the entire responsibility.*"

A second paper, dated July 19th, addressed to the public, reiterates this and concludes, "Whether he lives or dies, I have got the inspiration worked out of me."

We have now before us everything emanating from the prisoner about the time of the shooting and within a little over a fortnight afterwards. We have nothing further from him until over three months afterwards. Let us pause here to consider the import of all this.

You are to consider, first, whether this evidence fairly represents the true feelings and ideas which governed the prisoner at the time of the shooting. If it does, it represents a state of things which I have not seen characterized in any judicial utterance or authoritative work as an insane delusion.

You are to consider whether it is so described in the evidence, or does not, on the contrary, show a deliberate process of reasoning and reflection, upon argument and evidence for and against, resulting in an *opinion* that the president had betrayed his party, and that if he were out of the way it would be a benefit to his party, and save the country from the predominance of their political opponents. So far there was nothing insane in the *conclusion.* It was, doubtless, shared by a great many others. But the difference was that the prisoner, according to his revelations, went a step further, and reached the *conviction* that to put the president out of the way by assassination was a political necessity.

When men reason the law requires them to reason correctly, as far

as their practical duties are concerned. When they have the *capacity* to distinguish between right and wrong, they are bound to do it. Opinions, properly so called,—*i. e.*, beliefs resulting from reasoning, reflection, or examination of evidence,—afford no protection against the penal consequences of crime. A man may believe a course of action to be right, and the law, which forbids it, to be wrong. Nevertheless, he must obey the law, notwithstanding his convictions. And nothing can save him from the consequences of its violation, except the fact that he is so crazed by disease as to be unable to comprehend the necessity of obedience to it.

The Mormon prophets profess to be inspired, and to believe in the duty of plural marriages, although it was forbidden by a law of the United States. One of the sect violated the law, and was indicted for it. The judge who tried him instructed the jury—

"That if the defendant, under the influence of a religious belief that it was right,—under an inspiration, if you please, that it was right,—deliberately married a second time, having a first wife living, the want of consciousness of evil intent, the want of understanding that he was committing a crime, did not excuse him."

And the supreme court of the United States, to which the case went, under the title of *Reynolds* v. *U. S.* 98 U. S. 145, in approving this ruling, said:

"Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or, if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?

"So, here, as a law of the organization of society, under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed, can a man excuse his practice to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and, in effect, to permit every citizen to become a law unto himself. Government could exist only in name, under such circumstances."

And so, in like manner, I say, a man my reason himself into a conviction of the expediency and patriotic character of political assassination, but to allow him to find shelter from punishment behind that belief, as an insane delusion, would be simply monstrous.

Between one and two centuries ago there arose a school of moral-

ists who were accused of maintaining the doctrine that whenever an end to be attained is right, any means necessary to attain it would be justifiable. They were accused of practicing such a process of reasoning as would justify every sin in the decalogue when occasion required it. They incurred the odium of nearly all Christendom in consequence. But the mode of reasoning attributed to them would seem to be impliedly, if not expressly, reproduced in the papers written by the defendant and shown in evidence:

"It would be a right and patriotic thing to unite the republican party and save the republic. Whatever means may be necessary for that object would be justifiable. The death of the president by violence is the only and therefore the necessary means of accomplishing it, and therefore it is justifiable. Being justifiable as a political necessity, it is not murder."

Such seems to be the substance of the ideas which he puts forth to the world as his justification in these papers. If this is the whole of his position, it presents one of those vagaries of opinion for which the law has no toleration, and which furnishes no excuse whatever for crime.

This, however, is not all that the defendant now claims.

There is, undoubtedly, a form of *insane delusion*, consisting of a belief by a person that he is inspired by the Almighty to do something,—to kill another, for example,—and this delusion may be so strong as to impel him to the commission of a crime.

The defendant, in this case, claims that he labored under such a delusion and impulse, or pressure, as he calls it, at the time of the assassination.

The prisoner's unsworn declarations, since the assassination, on this subject, in his own favor, are, of course, not evidence, and are not to be considered by you. A man's language, when sincere, may be evidence of the condition of his mind when it is uttered, but it is not evidence in his favor of the facts declared by him, or, as to his previous acts or condition. He can never manufacture evidence in this way in his own exoneration.

It is true that the law allows a prisoner to *testify* in his own behalf, and thereby makes his sworn testimony on the witness-stand legal evidence, to be received and considered by you, but it leaves the weight of that evidence to be determined by you also.

I need hardly say to you that no verdict could safely be rendered upon the evidence of the accused party only, under such circumstances. If it were recognized, by such a verdict, that a man on trial for his life could secure an acquittal by simply testifying, him-

self, that he had committed the crime charged under a delusion, an inspiration, an irresistible impulse, this would be to proclaim in universal amnesty to criminals in the past, and an unbounded license for the future, and the courts of justice might as well be closed.

It must be perfectly apparent to you that the existence of such a delusion can be best tested by the language and conduct of the party immediately before and at the time of the act.

And while the accused party cannot make evidence *for* himself by his subsequent declarations, on the other hand, he may make evidence *against* himself, and, when those declarations amount to admissions against himself, they are evidence to be considered by a jury.

Let me here say a word about the characteristics of this form of delusion.

It is easy to understand that the conceit of being inspired to do an act may be either a sane belief or an insane delusion. A great many Christians believe, not only that events generally are providentially ordered, but that they themselves receive special providential guidance and illumination in reference to both their inward thoughts and outward actions, and, in an undefined sense, are inspired to pursue a certain course of action; but this is a mere sane belief, whether well or ill founded. On the other hand, if you were satisfied that a man sincerely, though insanely, believed that, like Saul of Tarsus, on his way to Damascus, he had been smitten to the earth, had seen a great light shining around him, had heard a voice from heaven, warning and commanding him, and that thenceforth, in reversal of his whole previous moral bent and mental convictions, he had acted upon this supposed revelation, you would have before you a case of imaginary inspiration amounting to an insane delusion.

The question for you to consider is, whether the case of the defendant presents anything analogous to this.

The theory of the government is that the defendant committed the homicide in the full possession of his faculties, and from perfectly sane motives; that he did the act from revenge, or perhaps from a morbid desire for notoriety; that he calculated deliberately upon being protected by those who were politically benefited by the death of the president, and upon some ulterior benefit to himself; that he made no pretense to *inspiration* at the time of the assassination, nor until he discovered that his expectations of help from the so-called

stalwart wing of the republican party were delusive, and that these men were denouncing his deed, and that then, for the first time, when he saw the necessity of making out some defence, he broached this theory of inspiration and irresistible pressure, forcing him to the commission of the act.

It this be true, you would have nothing to indicate the real motives of the act except what I have already considered. Whether it is true or not, you must determine from all the evidence.

It is true that the term "inspiration" does not appear in the papers first written by the defendant, nor in those delivered to Gen. Reynolds, except at the close of the one dated July 19th, in which he says that the *inspiration* is worked out of him; though what that means is not clear. It is true, also, that this was after, according to Gen. Reynolds, he had been informed how he was being denounced by the stalwart republicans.

In one of the first papers I have referred to, the president's removal was called an act of God, as were his nomination and election; but whether this meant anything more than that it was an act of God, in the sense in which all great events are said to be ordered by Providence, is not clear.

Dr. Noble Young testifies that a few days after defendant's entrance into the prison—a time not definitely fixed—he told him he was inspired to do the act, but qualified it by saying that if the president should die he would be confirmed in his belief that it was an inspiration; but if not, perhaps not.

The emphatic manner in which, in both the papers delivered to Gen. Reynolds, the defendant declared that the assassination was his *own conception* and execution, and *whether right or wrong* he took the entire responsiblity, his detailed description of the manner in which the idea occurred to him, and how it was strengthened by his reading, etc., and his omission to state anything about a direct inspiration from the Deity at that time, are all circumstances to be considered by you on the question whether he then held that idea.

On the other hand, you have the prisoner's testimony in which he *now* asserts that he conceived himself to be under an inspiration at the time. He also advanced this claim in his interviews with the expert witnesses shortly before the trial.

It becomes necessary, then, to examine the case on the assumption that the prisoner's testimony may be true, and to ascertain from his declaration and testimony what kind of inspiration it is which he thus asserts.

According to the testimony of Dr. Strong, he inquired of the defendant if he claimed to have had any direct revelation from heaven, and the answer was that he *did not believe in any such nonsense.*

According to Dr. McDonald, who interviewed the prisoner on the thirteenth of November, he did not then, in terms, speak of his idea of removing the president as an inspiration, but as a conception of his own, and said that, after conceiving the idea, he tried to put it aside; that it was repulsive to him at first; that he waited a week or two, thinking over it and waiting for the Almighty to interfere. He had conceived the idea himself, but he wished the Almighty to have the opportunity of interfering to prevent its execution; and at the end of two weeks, no interference coming from the Almighty, he formed the deliberate purpose of executing the act, etc.

According to the testimony of Dr. Gray, the prisoner said that he had received no instructions, heard no voice of God, saw no vision in the night, or at any time; that the idea came into his own mind first, and after thinking over it and reading the papers, when he arrived at the conclusion to do the act, he *believed then* it was a right act, and was justified by the political situation.

When asked how he could apply this as an instruction from the Deity, he said it was a *pressure* of the Deity; *that this duty of doing it, as he claimed, had pressed him to it.*

Again, he said *he had not connected the Deity with the inception and development of the act; that it was his own.* He did not get the inspiration until the time came for it, and that the inspiration came when he had reached the conclusion and determination to do the act.

Perhaps the most remarkable of the prisoner's statements to Dr. Gray was that at the very time when he was planning the assassination, he was also devising a theory of insanity which should be his defence, which theory was to be that he believed the act of killing was an inspired act.

Perhaps equally remarkable was the prisoner's theory propounded in this conversation, viz., that he was not *medically* insane, but *legally* so, *i. e., irresponsible,* because the act was done *without malice.*

Finally, on this subject, you have the defendant's own testimony.

He does not profess to have had any visions or direct revelation or distorted conception of facts.

But he says that while pondering over the political situation the idea suddenly occurred to him that if the president were out of the way the dissensions of his party would be healed; that he read the papers with an eye on the possibility of the president's removal, and

the idea kept pressing on him; that he was horrified; kept throwing it off; did not want to give it attention; tried to shake it off; but it kept growing upon him, so that at the end of two weeks his mind was thoroughly fixed as to the necessity for the president's removal and the divinity of the inspiration. He never had the slightest doubt of the divinity of the inspiration from the first of June. He kept praying about it, and that if it was not the Lord's will that he should remove the president there would be some way by which His providence would intercept the act. He kept reading the newspapers, and his inspiration was *being confirmed every day, and since the* first day of June he has never had a doubt about the divinity of the act.

In the cross-examination he said: If the political necessity had not existed the president would not have been removed—there would have been no necessity for the inspiration. About the first of June he made up his mind as to the inspiration of the act, and the necessity for it; from the sixteenth of June to the second of July he prayed that *if he was wrong*, the Deity would stop him by His providence; in May it was an embryo inspiration—a mere impression that possibly it might have to be done; he was doubting whether it was the Deity that was inspiring him, and was praying that the Deity would not let him make a mistake about it; and that at last it was the Deity, and not he, who killed the president.

Again, the confirmation that it was the Deity, and not the devil, who inspired the idea of removing the president, came to him in the fact that the newspapers were all denouncing the president. He saw that the political situation required the removal of the president, and that is the way he knew that his intended act was inspired by the Deity; but for the political situation, he would have thought that it came from the devil.

This is the substance of all that appears in the case on the subject of inspiration.

It is proper to call your attention to some variations in the prisoner's statements at different times.

In two of the papers of July he says it *was his own conception*, and he took the *entire responsibility*.

In the conversations reported by Dr. Gray, in November, he did not connect the Deity with the inception of the act. The conception was his own, and the inspiration came after he made up his mind; but he does not explain what he meant by the inspiration, unless it was that it was a pressure upon him, or, as he expresses it, the duty of doing it was pressing upon him.

In his testimony *he disclaims all responsibility,* while he still speaks of the idea of removing the president as an impression which arose in his own mind first. He says that in his reflections about it he debated with himself whether it came from the Deity or the devil; prayed that God would prevent it if it was not His will; and finally made up his mind, from a consideration of the political situation, that it was inspired by Him.

On all this the question for you is, whether, on the one hand, the idea of killing the president first presented itself to the defendant in the shape of a command or inspiration of the Deity, in the manner in which insane delusions of that kind arise, of which you have heard much in the testimony; or, on the other hand, it was a conception of his own, followed out to a resolution to act; and if he thought at all about inspiration, it was simply a speculation or theory, or theoretical conclusion of his own mind, drawn from the expediency or necessity of the act, that his previously-conceived ideas were inspired.

If the latter is a correct representation of his state of mind it would show nothing more than one of the same vagaries of reasoning that I have already characterized as furnishing no excuse for crime.

Unquestionably a man may be insanely convinced that he is inspired by the Almighty to do an act, to a degree that will destroy his responsibility for the act.

But, on the other hand, he cannot escape responsibility by baptizing his own spontaneous conceptions and reflections and deliberate resolves with the name of *inspiration.*

On the direct question whether the prisoner knew that he was doing wrong at the time of the killing, the only direct testimony is his own, to the contrary effect.

One or two circumstances may be suggested as throwing some light on the question.

The declaration that, *right or wrong,* he took the responsibility, made shortly afterwards, may afford some indication whether the question of wrong had suggested itself. And his testimony that he was horrified when the idea of assassination first occurred to him, and he tried to put it away, is still more pertinent.

His statement, testified to by Dr. Gray, that he was thinking of the defence of inspiration while the *assassination* was being planned, tends to show a knowledge of the *legal* consequences of the killing. His present statement, that no punishment would be too quick or severe for him if he killed the president otherwise than as agent of the Deity,

shows a present knowledge of the wrongfulness of the act in itself; but this declaration is of value on this question of knowledge, only in case you should believe that he had the same appreciation of the act at the time of its commission and disbelieve his story about the inspiration.

I have said nearly all that I need say on the subject of insane delusion.

The answer of the English judges, that I have referred to, has not been deemed entirely satisfactory, and the courts have settled down upon the question of knowledge of right and wrong as to the particular act, or rather the capacity to know it, as the test of responsibility; and the question of insane delusion is only important as it throws light upon the question of knowledge of, or capacity to know, the right and wrong.

If a man is under an insane delusion that another is attempting his life, and kills him in self-defence, he does not know that he is committing an unnecessary homicide. If a man insanely believes that he has a command from the Almighty to kill, it is difficult to understand how such a man *can* know that it is wrong for him to do it. A man may have some other insane delusion which would be quite consistent with a knowledge that such an act is wrong,—such as, that he had received an injury,—and he might kill in revenge for it knowing that it would be wrong.

And I have dwelt upon the question of insane delusion, simply because evidence relating to that is evidence touching the defendant's power, or want of power, from mental disease, to distinguish between right and wrong, as to the act done by him, which is the broad question for you to determine, and because that is the kind of evidence on this question which is relied on by the defence.

It has been argued with great force, on the part of the defendant, that there are a great many things in his conduct which could never be expected of a sane man, and which are only explainable on the theory of insanity. The very extravagance of his expectations in connection with this deed—that he would be protected by the men he was to benefit, would be applauded by the whole country when his motives were made known—has been dwelt upon as the strongest evidence of unsoundness.

Whether this and other strange things in his career are really indicative of partial insanity, or can be accounted for by ignorance of men, exaggerated egotism, or perverted moral sense, might be a question

of difficulty. And difficulties of this kind you might find very perplexing, if you were compelled to determine the question of insanity generally, without any rule for your guidance.

But the only safe rule for you is to direct your reflections to the one question which is the test of criminal responsibility, and which has been so often repeated to you, viz., whether, whatever may have been the prisoner's singularities and eccentricities, he possessed the mental capacity, at the time the act was committed, to know that it was wrong, or was deprived of that capacity by mental disease.

In all this matter there is one important distinction that you must not lose sight of, and you are to decide how far it is applicable to this case. It is the distinction between mental and moral obliquity; between a mental incapacity to understand the distinctions between right and wrong, and a moral indifference and insensibility to those distinctions. The latter results from a blunted conscience, a torpid moral sense or depravity of heart; and sometimes we are not inapt to mistake it for evidence of something wrong in the mental constitution. We have probably all known men of more than the average of mental endowments, whose whole lives have been marked by a kind of moral obliquity and apparent absence of the moral sense. We have known others who have first yielded to temptation with pangs of remorse, but each transgression became easier, until dishonesty became a confirmed habit, and at length all sensitiveness of conscience disappeared.

When we see men of seeming intelligence and of better antecedents reduced to this condition, we are prone to wonder whether the balance-wheels of the intellect are not thrown out of gear. But indifference to what is right is not ignorance of it, and depravity is not insanity, and we must be careful not to mistake moral perversion for mental disease.

Whether it is true or not that insanity is a disease of the physical organ, the brain, it is clearly in one sense a disease, when it attacks a man in his maturity. It involves a departure from his normal and natural condition. And this is the reason why an inquiry into the man's previous condition is so pertinent, because it tends to show whether what is called an act of insanity is the natural outgrowth of his disposition or is utterly at war with it, and therefore indicates an unnatural change.

A man who is represented as having been always an affectionate parent and husband, suddenly kills wife and child. This is something so unnatural for such a man that a suspicion of his insanity arises at

once. On further inquiry we learn that instead of being as represented, the man was always passionate, violent, and brutal in his family. We then see that the act was the probable result of his bad passions, and not of a disordered mind.

Hence the importance of viewing the moral as well as intellectual side of the man, in the effort to solve the question of sanity.

That evidence on this subject is proper was held by the supreme judicial court of New Hampshire in *State* v. *Jones*, 50 N. H. Judge Ladd said:

"The history of the defendant and evidence of his conduct at various times during a period of many years before the act for which he was tried, tending to show his temper, disposition, and character, were admitted against his objection. It was for the jury to say whether the act was the product of insanity, or the naturally malignant and vicious heart. The condition of the man's mind, whether healthy or diseased, was the very matter in issue. This must be determined in some way or other from external manifestations as exhibited in his conduct. To know whether an act is the product of a diseased mind it is important to ascertain, if possible, how the same mind acts in a state of health. The condition of sanity or insanity shown to exist at one time is presumed to continue. For these reasons and others, which I have not thought it necessary to enlarge upon, it would seem that evidence tending to show defendant's mental and moral character and condition for many years before the act, was properly received."

It was upon the principle enunciated in this case that evidence was received in the present case tending to show the moral character of the accused, and offered for the purpose of showing that eccentricities relied on as proof of unsound mind were accounted for by want of moral principle.

From the materials that have been presented to you two pictures have been drawn by counsel.

The one represents a youth of more than the average of mental endowments, surrounded by certain demoralizing influences at a time when his character was being developed; starting in life without resources, but developing a vicious sharpness and cunning; conceiving "enterprises of great pith and moment," that indicated unusual forecast, though beyond his resources; consumed all the while by insatiate vanity and craving for notoriety; violent in temper, selfish in disposition, immoral, and dishonest in every direction; leading a life, for years, of hypocrisy, swindling, and fraud; and finally, as the culmination of a depraved career, working himself into a resolution to startle the country with a crime that would secure him a bad eminence, and, perhaps, a future reward.

The other represents a youth born, as it were, under malign influences, the child of a diseased mother, and a father subject to religious delusions; deprived of his mother at an early age; reared in retirement and under the influence of fanatical religious views; subsequently, with his mind filled with fanatical theories, launched upon the world with no guidance save his own impulses; then evincing an incapacity for any continuous occupation; changing from one pursuit to another—now a lawyer, now a religionist, now a politician—unsuccessful in all; full of wild impracticable schemes, for which he had neither resources nor ability; subject to delusions about his abilities and prospects of success, and his relations with others; his mind incoherent and incapable of reasoning connectedly on any subject; withal, amiable, gentle, and not aggressive, but the victim of surrounding influences, with a mind so weak and a temperament so impressible that, under the excitement of political controversy, he became frenzied and insanely deluded, and thereby impelled to the commission of a crime, the guilt of which he could not, at the moment, understand.

It is for you to determine which of these is the portrait of the accused.

Before saying a last word my attention has just been called to, and I have been requested by counsel for the defendant to give, certain additional instructions. One is:

"It is the duty of each juror to consider the evidence, all pertinent remarks of counsel, and all the suggestions of fellow-jurors, but to disregard all statements of counsel and declarations of the prisoner except such as are founded upon the evidence."

Of course, that is a truism, and does not require any particular instruction.

"The testimony of the prisoner they will weigh as to credibility, and judge of by the same rules and considerations applied to that of other witnesses."

That is all true, provided that all the influences that governed the prisoner are duly weighed and considered.

"And after all, each juror should decide for himself upon his oath as to what his verdict should be. No juror should yield his deliberate, conscientious conviction as to what the verdict should be, either at the instance of a fellow-juror or at the instance of a majority. Above all, no juror should yield his honest convictions for the sake of unanimity, or to avert the disaster of a mistrial. Jurors have nothing to do with the consequences of their verdict."

All that, gentlemen, is true. Some of it is substantially embodied I think, in what I have already said.

"The opinions of experts upon the question of the sanity or insanity of the prisoner on the second day of July last, which is the only date as to which it is necessary for the jury to agree upon, on that question, rests wholly upon the hypothetical questions proposed to them, and the jury must believe, from the evidence, that the supposed facts stated in a hypothetical question are true, to entitle the answer thereto to any weight."

I cannot give that one because I think their opinions may be founded upon other grounds than the assumed truth of the hypothetical question; or, at least, that is a question for the jury.

'The fact of insanity or sanity of the prisoner before or after the second day of July, 1881, is not in issue in this case, except as collateral to the main fact of sanity or insanity at the time of shooting of President Garfield, on the second day of July, 1881; and the only evidence as to such main fact is in the testimony of the prisoner himself, his words and acts, and the testimony of the experts in answer to the hypothetical question."

That is, I think, one that I cannot give, because the question involved is one of fact for the jury.

And now, to sum up all that I have said, in a few words:

If you find from the whole evidence that, at the time of the commission of the homicide, the prisoner, in consequence of disease of mind, was laboring under such a defect of his reason that he was incapable of understanding what he was doing, or that it was wrong,—as, for example, if he was under an insane delusion that the Almighty had commanded him to do the act, and in consequence of that he was incapable of seeing that it was a wrong thing to do,—then he was not in a responsible condition of mind, and was an object of compassion, and not of justice, and ought to be now acquitted.

On the other hand, if you find that he was under no insane delusion, such as I have described, but had possession of his faculties and the power to know that his act was wrong, and of his own free will deliberately conceived, planned, and executed this homicide, then, whether his motive was personal vindictiveness or political animosity, or a desire to avenge a supposed political wrong, or a morbid desire for notoriety, or fanciful ideas of patriotism or of the divine will, or you are unable to discover any motive at all, the act is simply *murder*, and it is your duty to find him guilty.

Now gentlemen, retire to your rooms and consider this matter, and make due deliberation in the case of the United States against Guiteau.

*Mr. Scoville.* Is it not proper that your honor should instruct the

jury as to the form of their verdict, if they find him not guilty by reason of insanity?

*The Court.* (To the jury.) If you should think that the prisoner i' not guilty by reason of insanity, it is proper for you to say so.

At this point (4 o'clock and 35 minutes P. M.) the jury retired to deliberate.

*Mr. Scoville.* I will also inquire, your honor, as to the exceptions; what is the practice?

*The Court.* The charge will be in print, and you can have the privilege of exception to any part of it.

*Mr. Scoville.* And also in relation to the questions of law which we asked your honor to instruct upon?

*The Court.* Yes.

At 4 o'clock and 55 minutes P. M. the court took a recess until 5 o'clock and 30 minutes P. M., the jury being in deliberation.

At 5 o'clock and 40 minutes the jury, accompanied with the marshal and bailiffs, returned to the box and were called, all answering to their names, as follows:

John P. Hamlin, Frederick W. Brandenburg, Henry J. Bright, Charles T. Stewart, Thomas H. Langley, Michael Sheehan, Samuel F. Hobbs, George W. Gates, Ralph Wormley, William H. Brawner, Thomas Heinline, and Joseph Prather.

*The Clerk.* Gentlemen of the jury, have you agreed upon a verdict?

*Mr. Hamlin,* (the foreman.) We have.

*The Clerk.* What say you? Is the defendant guilty or not guilty?

*Mr. Hamlin,* (the foreman.) Guilty as indicted, sir.

*Mr. Scoville.* If the court please—

[Great applause, with cries of "Silence!" from the bailiffs.]

*Mr. Davidge.* (Interposing excitedly.) Let the verdict of the jury be recorded first.

*The Clerk.* Gentlemen of the jury, hear your verdict as recorded. Your foreman says that the defendant, Charles J. Guiteau, is guilty as indicted. So say you all?

*The Jury.* (*Omnes.*) So say we all.

*Mr. Scoville.* If the court please, I desire to have the jury polled.

*The Court.* Let the jury be polled.

*The Clerk.* (Calling the roll.) John P. Hamlin, is the defendant guilty or not guilty?

*John P. Hamlin.* Guilty.

*The Clerk.* Frederick W. Brandenburg, is the defendant guilty or not guilty?

*Frederick W. Brandenburg.* Guilty.

*The Clerk.* Henry J. Bright, is the defendant guilty or not guilty?

*Henry J. Bright.* Guilty.

*The Clerk.* Charles F. Stewart, is the defendant guilty or not guilty?

*Charles F. Stewart.* Guilty.

*The Clerk.* Thomas H. Langley, is the defendant guilty or not guilty?

*Thomas H. Langley.* Guilty.

*The Clerk.* Michael Sheehan, is the defendant guilty or not guilty?

*Michael Sheehan.* Guilty.

*The Clerk.* Samuel F. Hobbs, is the defendant guilty or not guilty?

*Samuel F. Hobbs.* Guilty.

*The Clerk.* George W. Gates, is the defendant guilty or not guilty?

*George W. Gates.* Guilty.

*The Clerk.* Ralph Wormley, is the defendant guilty or not guilty?

*Ralph Wormley.* Guilty.

*The Clerk.* William H. Brawner, is the defendant guilty or not guilty?

*William H. Brawner.* Guilty.

*The Clerk.* Thomas Heinline, is the defendant guilty or not guilty?

*Thomas Heinline.* Guilty.

*The Clerk.* Joseph Prather, is the defendant guilty or not guilty?

*Joseph Prather.* Guilty.

*The Prisoner.* (Excitedly.) My blood be on the head of that jury; don't you forget it. That is my answer.

*Mr. Scoville.* I understand I have the time to file a motion.

*The Court.* You have four days within which to file the motion.

*Mr. Scoville.* If there is anything else that I ought to do just now, your honor, I hope I will not be cut off.

*The Court.* If you have a desire to move in arrest of judgment, you can file your motion for a new trial, and in arrest of judgment, and if that should be overruled, be heard afterwards.

*Mr. Scoville.* That is, the motion for a new trial will be first heard.

*The Court.* The motion for a new trial must be first heard, and in case you then think proper, a motion in arrest of judgment. But they must both be filed in four days. You reserve an exception to the refusal to granting your instructions and to the charge.

*Mr. Scoville.* Yes. And to the charge. I expect to have that in the morning, and I desire to express that more particularly.

*The Court.* Yes.

*The Prisoner.* (Excitedly.) God will avenge this outrage.

*The Court.* Gentlemen of the jury, I cannot express too much thanks to you, both in my own name and in the name of the public, for the diligence and fidelity with which you have discharged your duties; for the patience with which you have listened to this long mass of testimony, and the lengthy discussion by counsel; and for the patience with which you have borne with the privations and inconveniences incident to this trial. I am sure that you will take home with you the approval of your own consciences as you will have that of your fellow-citizens. With thanks and good wishes, I discharge you from any further service at this term of the court.

Thereupon (at 5 o'clock and 55 minutes P. M.) the court adjourned.

### NOTE.

MORAL INSANITY. One of the incidental benefits arising from the Guiteau trial has been the development of the fact that the theory of moral insanity has no longer any professional medical opinion in its favor. In the London *Lancet* of December 12, 1881, we find the following:

"We fancied the 'plea of insanity' had been reduced to absurdity in the ridiculous attempt made to show that Lefroy was insane; but it seems that the apotheosis of stupidity is to take place in America. It is high time the nonsense recently talked and written about 'irresponsibility' should be exposed and ended. If the supreme triumph of medical psychology is to be sought in the attempt to prove that men are mere machines, and that the wrong they do is not their doing, but the outcome of disease, the sooner this branch of science is discountenanced by the common sense of the profession the better will it be for the credit and influence of our cloth. If a man is not acting under a recognizable and formulated delirium when he commits a crime, he is clearly responsible, and ought to be so held unless he is unquestionably, and on grounds other than those arising out of or associated with his crime, shown to be insane. The mistake into which 'experts' and those who follow their lead commonly fall is to confound the evidences of a neurotic constitution with the symptoms of mental disease. The inheritor of an organism which predisposes to insanity is not necessarily insane. Lefroy was not insane, and Guiteau is not insane. The only insanity accruing to the latter case is that which those who support the plea may themselves import into it. The position of matters in regard to this question is becoming one of exceeding gravity, and it will soon need to be very seriously discussed."

In the *North American Review* for January, 1882, we have opinions from eminent alienists,—Dr. Elwell, Dr. Beard, Dr. Seguin, Dr. Jewell, and Dr. Folsom, —by all of whom the theory of moral insanity, as such, is repudiated. The highest psychological authority is to the same effect. Sir William Hamilton, in defining the mind, says: "If we take the mental to the exclusion of material phenomena,—that is, the phenomena manifested through the medium of self-consciousness or reflection,—they naturally divide themselves into three categories or primary genera: the phenomena of *knowledge* or *cognition*, the phenomena

of *feeling* or of *pleasure and pain,* and the phenomena of *conation* or of *will and desire.*" Mr. Bain, belonging to a very different school, arrives, in an authoritative work, substantially at the same result. Ment. & Mor. Science, (2d Ed.) 2. "The only account of mind strictly admissible in scientific psychology consists in specifying three properties or functions,—*feeling, will or volition, and thought or intellect,*—through which all our experience, as well objective as subjective, is built up. This positive enumeration is what must stand for a definition." He proceeds to say that "FEELING includes all our pleasures and pains, and certain modes of excitement, or of consciousness simply, that are neutral or indifferent as regards pleasure and pain. The pleasures of warmth, food, music, the pains of fatigue, *poverty, remorse,* the excitement of hurry and surprise, the supporting of a light weight, *the touch of a table, the sound of a dog barking in the distance,* are feelings. The two leading divisions of the feelings are commonly given as sensations or emotions." "WILL OR VOLITION *comprises all the actions of human beings in so far as impelled or guided by feelings.* Eating, walking, building, sowing, speaking are actions performed with some *end* in view; and ends are comprised in the gaining of pleasure or the avoiding of pain. *Actions not prompted by feeling are not voluntary.* Such are the powers of nature—wind, gravity, electricity, etc.; so, also, the organic functions of breathing, circulation, and the movements of the intestines." THOUGHT, INTELLECT, intelligence, or cognition, includes the powers known as perception, memory, conception, abstraction, reason, judgment, and imagination. It is analyzed, as will be seen, into three functions, called discrimination or consciousness of difference, similarity or consciousness of agreement, and retentiveness or memory. *The mind can seldom operate exclusively in any one of these three modes.* A feeling is apt to be accompanied more or less by will and by thought. When we are pleased, our will is moved for continuance or increase of the pleasure, (will;) we at the same time discriminate and identify the pleasure, and have it impressed on the memory, (thought.)"

If we apply this analysis to the hypothesis before us, we will see that the latter cannot stand. A man, for instance, is assaulted by another, or conceives himself so to be, so as to be in danger of losing either life or that which is more precious to him than life. FEELING is the first function of the mind which is here addressed; but this necessarily involves THOUGHT. "Is the assault intentional?" "Was it designed?" "Can I infer, judging from former assaults, or from what I have observed or heard, that it is aimed at life?" "Can it be repelled in no other way than by killing the assailant?" Pursuing inquiries such as these, FEELING, guided by THOUGHT, directs the WILL to the particular object. Without THOUGHT, FEELING would strike blindly into mere space. Even in the lowest point of view, discrimination is needed to distinguish the victim from others, and judgment to determine that killing him is a proper act of self-defence. THOUGHT, therefore, is necessarily involved in the act of killing, and the killing takes place because the assailant thinks it best. To constitute a valid plea of derangement in such a case, it is necessary to show that the perceptive and reasoning powers were deranged; otherwise, the case would not differ from that of homicide in a sudden fit of rage.

Or take the case of "kleptomania." The FEELING which lies at its base is

longing for some particular thing. But to shape as well as to effectuate this longing, THOUGHT must be invoked. Thought is needed to identify the object with that which previously gave gratification; to distinguish it from other objects; to secrete it; to carry it successfully away. In true kleptomania, so far from the derangement being distinctively in the feeling, such derangement is to be peculiarly traced to thought or intellect. It is no mark of derangement on entering a jewelry store to desire a brilliant that may lie on the counter. But to *think* either that it is right to take it, or that it can be taken without disgrace, assumes an abnormal and insane condition of intellect.

The same reasoning applies to all cases of alleged monomania. A child sets fire to a house, (pyromania.) Here the child selects the particular house by *thought;* applies the match with *thought;* is determined to the act by a mental process on whose sanity or insanity the question of responsibility depends. Or sexual propensity is yielded to without restraint, (erotomania;) and here, also, thought, in its lowest phases of memory, distinction, and identification, is necessary to procure gratification, while in its higher phase of reason and sense of right it must exist in a normal state to create responsibility. The insanity, in other words, cannot be psychologically shown, unless it affects *thought.*

The difficulty is that "moral insanity," in the popular acceptation of the term, includes two distinct diseases. The first, following the phraseology of Bain and Hamilton, as just stated, is that of enfeebled or paralyzed thought, approaching dementia. Here feeling, held in but slight check by the reasoning powers, acts on the will, involving thought only so far as is necessary to identify and secure the object of desire. The other case is that of delirous or deluded thought, where unreal objects are set up for feeling to desire. But in both cases the primary seat of the disease is in THOUGHT and INTELLECT.

How unsatisfactory are the analogies which are invoked to explain this alleged *separateness* of the moral sense, will readily be seen. The reason, the memory, the moral sense, it is declared, are each packed away in a series of hermetical compartments; and, so far from their mutually commingling, one may be actually insane without the others being in any sense affected. Man is thus like an iron steam-boat, whose hull is divided into a series of water-tight chambers, so arranged that if the rivets of one chamber loosen or its plates decay, the injury sustained is to itself alone. But it would be far more correct to compare the *ego* to the steamer's machinery, in which the derangement of one particular part is the derangement of the whole. Taking reason in its large sense, we must all admit that reason and the moral sense are in the highest degree interdependent. Thus, if an act is repugnant to our moral sense, the closest logical process will fail to convince us of its propriety. On the other hand, even if we should concede, as we have no right to do, that there is such a thing as an innate moral sense, we must accept the alternative that a moral sense is one which may be built up by education—penal discipline being one of the chief instruments by which this education can be imparted.*

DELUSIONS. The testimony of the experts, during the course of the trial, taken in connection with Judge Cox's charge, as given above, have gone a great way to finally establishing the rule that delusions to constitute a defence

---

*Parts of the above argument are taken from the forthcoming fourth edition of my book on Medical Jurisprudence, now in press.

must be objective as distinguished from subjective. They must be delusions of the senses, or such as relate to facts or objects, not mere wrong notions or impressions; and the aberration in such case must be mental, not moral, and must affect the intellect of the individual. It is not enough that they show a diseased or depraved state of mind, or an aberration of the moral feelings, the sense of right and wrong continuing to exist, although it may be in a perverted condition. To enable them to be set up as a defence to an indictment for a crime, they must go to such crime objectively; *i. e.*, they must involve an honest mistake as to the object at which the crime is directed. See *Rex* v. *Burton*, 3 F. & F. 772; *Rex* v. *Townley*, 3 F. & F. 839.

The distinction before us may be illustrated by *Levett's Case*, which has never been questioned, and which has been sanctioned by the most rigid of the common-law jurists, where it was held a sufficient defence to an indictment for murder, that the mortal blow was struck by the defendant under the delusion that the deceased was a robber, who had entered the house. *Levett's Case*, Cro. Cas. 438; and see *Rex* v. *Townley*, *supra*. It would have been otherwise had the delusion been that the victim was a political opponent whom it was politic to remove. To this effect is the opinion of Chief Justice Shaw, in 1844, in *Com.* v. *Rogers*, 7 Metc. 500. "Monomania," said this eminent judge, "may operate as an excuse for criminal act," when "the delusion is such, that the person under its influence has a real and firm belief of some fact, not true in itself, but which, if it were true, would excuse his act; as where the belief is that the party killed had an immediate design upon his life, and under that belief the insane man kills in supposed self-defence. *A common instance is where he fully believes that the act he is doing is done by the immediate command of God, and he acts under the delusive but sincere belief that what he is doing is by the command of a superior power, which supersedes all human laws and the laws of nature.*" To make such a delusion a defence, however, there must be no consciousness of the wrongfulness of the act to which the delusion prompts. If there be reason enough to dispel the delusion; if the defendant obstinately refuses, under such circumstances, to listen to arguments by which the delusion could be dispelled; if, on the contrary, he cherishes such delusion, and makes it the pretext of wrongs to others,—then he is responsible for such wrongs. Thus, in a case of homicide in Delaware, in 1851, the deceased being the defendant's wife, the defence was delusion consisting in a belief that his wife was untrue to him, that his children were begotten by his wife's intercourse with another, and that sundry conjurations were being practiced upon him, and the evidence showed that he was a shrewd and wealthy business man. The court charged the jury that if a person, otherwise rational, commit a homicide, though affected by delusions on subjects with which the act is connected, he is criminally responsible, if he were capable of the perception of consciousness of right and wrong as applied to the act, and, had the ability through that consciousness to choose by an effort of the will whether he would do the deed. *State* v. *Windsor*, 5 Harr. 512. And this is good law.

IRRESISTIBLE IMPULSE. "Irresistible impulse" is not "moral insanity," defining "moral insanity" to consist of insanity of the moral system, co-existing with mental sanity. "Moral insanity," as thus defined, has no support,

as we have already seen, either in psychology or law. Nor is "irresistible impulse" convertible with passionate propensity, no matter how strong in persons not insane. In other words, the "irresistible impulse" of the lunatic which confers irresistibility, is essentially distinct from the passion, however violent, of the sane, which does *not* confer irresponsibility. As this distinction is of great importance, we will now notice the reason on which it rests.

Supposing the mind to be sane, and that there is a capacity of judging between right and wrong, there is psychologically no impulse which the law can treat as irresistible. The will is either free, which settles the question at once, or it is directed by the strongest motives, as the necessitarian holds. Now, taking the latter hypothesis, the question arises, supposing the will to follow by necessity the strongest motive, whether it is just to punish the wrong-doer for such necessary act. That it is, is affirmed by the leading representatives of the necessitarian school. "It is said," says Mr. Bain, (Mental and Moral Science, London, 1868, p. 404,) "that it would not be right to punish a man unless he were a free agent; a truism, if by freedom is meant only the absence of outward compulsion; *if in any other sense, a piece of absurdity. If it is expedient to place restrictions upon the conduct of sentient beings, and if the threatening of pain operates to arrest such conduct, the case for punishment is made out.* We must justify the institution of law, to begin with, and the tendency of pain to prevent the actions that bring it on, in the next place. * * * Granting these two postulates, punishability (carrying with it, in a well-constituted society, responsibility) is amply vindicated. * * * Withdraw the power of punishing, and there is left no conceivable instrument of moral education. It is true that a good moral discipline is not wholly made up of punishment; the wise and benevolent parent does something, by the methods of allurement and kindness, to form the virtuous dispositions of his child. *Still, we may ask, was ever any human being educated to the sense of right and wrong without the dread of pain accompanying forbidden actions?* It may be affirmed with safety that punishment or retribution, in some form, is one-half of the motive power to virtue in the very best of human beings, while it is more than three-fourths in the mass of mankind." Now, erroneous as is Mr. Bain's position that the primary ground of punishment is prevention to be effected by fear, there can be no question that on the necessitarian hypothesis his reasoning is sound.

Mr. J. S. Mill, in his examination of Sir W. Hamilton's philosophy, supposes the case of a race of men whose hereditary tendencies to mischief are as great and uncontrollable as those of lions and tigers, than which no case brought up by the advocates of the unpunishability of those subject to irresistible propensities could be more strong. Having supposed such men, he asks whether we would not treat them precisely as we would a wild beast, even though we supposed them to act necessarily. The highest theory of fatalism, he infers from this, is not inconsistent with the infliction of penalties on the offender. The question that arises, then, is, is such punishment just? Can we justly punish a man for that which he cannot help? And he argues that we certainly can, if announcing beforehand that such offenders are to be punished;

and supporting the announcement by inflexible and uniform execution, is the way to keep them from committing the obnoxious act. If the end—the prevention of crime—is justifiable, then the necessary steps for the prevention of crime are also justifiable. And despotic as is the assumption that punishment is to be inflicted, not as a matter of justice in obedience to a preannounced law, but as a matter of policy irrespective of deserts, the conclusion legitimately follows from Mr. Mill's premises.

It being, therefore, settled that "irresistible impulse," to constitute a defence, must be that of a person otherwise insane, we proceed to consider the authorities that establish such impulse, under such conditions, as a defence. In doing so it must be, at the outset, conceded that, by the English courts, this defence, as here stated, is rejected. No person, however insane, can, by the law as now (1882) expounded by those courts, be acquitted of a crime if it appear to the satisfaction of the jury that he knew the nature and quality of the act he was doing, or, if he did not know it, if he knew that the act was wrong. But if, as may readily be shown, it is demonstrable that there sometimes is, among insane persons, an "irresistible impulse" to an act co-existing with a knowledge that it was wrong, then comes the question whether lunatics of this stamp are legally punishable for such acts. That they are not, the tendency of American authority is to maintain. And even in England we find Mr. Stephen, in his work on English Criminal Law, (London, 1863, p. 91,)— a work as remarkable for philosophical symmetry as for legal accuracy,—stating (1863) the questions to be, "in popular language, *Was it his act? Could he help it? Did he know it was wrong?*" He goes on further to say: "It would be absurd to deny the possibility that such [irresistible] impulses may occur, or the fact that they have occurred, and have been acted on. Instances are also given in which the impulse was felt, and was resisted. The only question which the existence of such impulses can raise in the administration of criminal justice, is whether the particular impulse in question was irresistible as well as unresisted. *If it were irresistible the person accused is entitled to be acquitted, because the act was not voluntary, and was not, properly, his act. If the impulse was irresistible,* the fact that it proceeded from disease is no excuse at all." See *McFarland's Case,* 8 Abb. N. Y. Pr. (N. S.) 57. In Sir J. Stephen's testimony before the English homicide committee the same view is taken. Whart. Crim. Law, (8th Ed.) § 45.

In Illinois, in 1863, it was declared by the supreme court that a safe and reasonable test would be, that whenever it should appear from the evidence that, at the time of doing the act charged, the prisoner was not of sound mind, but affected with insanity, and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he should be acquitted. But this unsoundness of mind, or affection of insanity, must be of such a degree as to create an uncontrollable impulse to do the act charged by overriding the reason and judgment, and obliterating the sense of right and wrong as to the particular act done, and depriving the accused of the power of choosing between them. If it be shown the act was the consequence of an insane delusion, and caused by it, and by nothing else, justice and humanity alike demand an acquittal. Sound mind is presumed if the accused is neither an idiot, a lunatic, nor "affected with insanity." If he be insane, sound mind

is wanting, and the crime is not established; therefore, the burden is on the state to establish sanity, and not upon the prisoner to show insanity. See *Fisher* v. *People*, 23 Ill. 283; *Hopps* v. *People*, 31 Ill. 394. So, also, Judge Brewster, speaking for the judges of the Philadelphia common pleas, said, in 1868: "The true test in all these cases lies in the word 'power.' Has the defendant in a criminal case the power to distinguish right and wrong, and the power to adhere to the right and avoid the wrong?" *Com.* v. *Haskell*, 2 Brewst. 491.

In Indiana a similar view was accepted in 1869. *Stevens* v. *State*, 31 Ind. 485.

In Ohio insane irresistible impulse is regarded as a defence; *Blackburn* v. *State*, 23 Ohio St. 146; and such is the view in Minnesota; *State* v. *Gut*, 13 Minn. 341; and in Kentucky; *Smith* v. *Com.* 1 Duv. 224. In Iowa, in 1868, the same point was affirmed by the supreme court, Chief Justice Dillon delivering the opinion. The capacity to distinguish right and wrong, it was held, is not in all cases a safe test of criminal responsibility. If a person commit a homicide, knowing it to be wrong, but driven to it by an uncontrollable and irresistible impulse, arising not from natural passion, but from an insane condition of the mind, he is not criminally responsible. *State* v. *Felter*, 25 Iowa, 67. See, also, *McFarland's Case*, 8 Abb. Pr. (N. S.) 57, and *Mary Harris' Case*, 22 Am. Jour. Ins. 334. To the same effect is a decision of the supreme court of the United States in 1872. *Life Ins. Co.* v. *Terry*, 15 Wall. 580. See, also, *Blackburn* v. *State*, 23 Ohio St. 165; *Brown* v. *Com.* 78 Pa. St. 122; and other cases in Whart. Crim. Law, (8th Ed.) 145.

In North Carolina, on the other hand, it has been ruled that no impulse, however irresistible, is a defence when there is a knowledge of the difference as to the particular act between right and wrong. *State* v. *Brandon*, 8 Jones, 463. And there is no question that the position that an irresistible impulse can be a defence is inconsistent with the rule laid down in the great body of cases which sustain the "right and wrong" test as an exclusive standard. And even where this test is not so received, irresistible impulse is no defence unless the defendant is proved *aliunde* to be insane.

Thus, in *People* v. *Coleman*, N. Y. Dec. 1881, Judge Davis charged the jury as follows: "In this state the test of responsibility for criminal acts, where insanity is asserted, is the capacity of the accused to distinguish between right and wrong at the time and with respect to the act which is the subject of inquiry." He further said that the question for the jury to determine is "whether at the time of doing the act the prisoner knew what she was doing and that she was doing a wrong; or, in other words, did she know that she was shooting at the deceased, and that such shooting was a wrongful act?" The judge further said: "No imaginary inspiration to do a personal or private wrong, under a delusion, a belief, that some great public benefit will flow from it, where the nature of the act done and its probable consequences, and that it is in itself wrong, are known to the actor, can amount to that insanity which in law disarms the act of criminality. Under such notions of legal insanity, life, property, and rights, both public and private, would be altogether insecure, and every man who, by brooding over his wrongs, real or imaginary, shall work himself up to an irresisistible impulse to avenge himself, or his

friend' or his party, can with impunity become a self-elected judge, jury, and executioner in his own case, for the redress of his own injuries or the imagi-nary wrongs of his friends, his party, or his country. But, happily, that is not the law, and whenever such ideas of insanity are applied to a given case as the law, (as too often they have been,) crime escapes punishment, not through the legal insanity of the accused, but through the emotional insanity of courts and juries."

To the same general effect may be cited *Rex* v. *Oxford,* 9 C. & P. 525; *Burrow's Case,* 1 Lewin, 238; *Rex* v. *Goode,* 7 Ad. & El. 536; 67 Haris. Par. Deb. 728; *Bowler's Case, Hadfield's Case,* Id. 480; 27 How. St. Tr. 1282; *Rex* v. *Barton,* 3 Cox, C. C. 275; *Rex* v. *Oxford,* 5 C. & P. 168; *Rex* v. *Higginson,* 1 C. & K. 129; *Rex* v. *Stokes,* 3 C. & K. 185; *Rex* v. *Layton,* 4 Cox, C. C. 149; *Rex* v. *Vaughan,* 1 Cox, C. C. 80; *U. S.* v. *Shults,* 6 McL. 121; *Com.* v. *Rogers,* 7 Metc. 500; 7 Bost. Law Rep. 449; *State* v. *Richards,* 39 Conn. 591; *Freeman* v. *People,* 4 Denio, 9; *Flanagan* v. *People,* 52 N. Y. 467; *People* v. *Sprague,* 2 Parker, C. R. 43; *State* v. *Spencer,* 1 Zabriskie, 196; *Com.* v. *Mosler,* 4 Barr, 264; *Com.* v. *Farkin,* 3 Penn. L. J. 480; *Brown* v. *Com.* 78 Pa. St. 122; *State* v. *Gardiner,* Wright, (Ohio,) 392; *Vance* v. *Com.* 2 Virg. C. 132; *McAllister* v. *State,* 17 Ala. 434; *Dove* v. *State,* 3 Heisk. 348; *Stuart* v. *People,* 1 Baxter, 178.

MANAGEMENT OF THE TRIAL. On Judge Cox's management of the trial almost unqualified commendation can be bestowed. In a very intelligent letter from Washington, in the *Independent* of February 9, occurs the following:

"Was there ever before in a tribunal of enlightened people such concentrated and accumulated disgrace and real cause for shame? A vituperative criminal, whose impudence and indecency could be equalled only by his fluency and keenness of perception and repartee; a hissing, jeering, and applauding audience; perpetually wrangling counsel; all three antagonistic forces often talking and fighting at once; with a judge who, to all appearance, was utterly inadequate to manage or control either,—such was the trial of an unprece-dented criminal, for an unpardonable crime, which for 10 weeks disgraced this country and made a shameful spectacle for the whole world. Who that day after day listened to loud and vengeful shouts of the prisoner, to the bick-ering and quarrelling of the lawyers, could believe that this trial could ever mount to a climax that could, at last, simply express dignity and law? Yet out of all this chaos, this disgrace, the supreme moment came. It came when the much-berated, long-suffering, too mild, yet noble judge uttered his final charge, and when, 30 minutes later, the intelligent jury returned, to give out from its united conscience the verdict: 'Guilty as indicted. Thus say we all.'

"Then, not till then, was justice vindicated.

"The charge of Judge Cox was a surprise to all, save the few who knew the real measure of the man. It was a surprise to the prisoner, who, after the long weeks of leniency, forgiveness, and indulgence, which he had abused, under this judge's rulings, fully expected a charge that would move the jury towards his favor. It was a surprise to the spectators, who, witnessing his indulgence, had almost invariably concluded that 'Judge Cox favored Gui-teau;' but it was not a surprise to any one who knew Judge Cox.

"And, as so much misunderstanding, misjudgment, and harsh judgment have inevitably spread through the land concerning this gentleman, I will say a few words for him, in simple justice. Into every just judgment of an indi-

vidual must enter some discriminating knowledge of his antecedents, his education, his temperament, his nature. Such elements as enter into the 'make-up' of Judge Cox are rarely seen in any man, north or south, who has achieved success or eminence. Said one who knows him well, 'I have never seen any man really eminent who had so little self-consciousness.' 'Judge Cox is the most unpretentious man I ever knew. He assumes nothing.'

"Judge Walter Cox was born in Georgetown, and is by birth, association, and training a real son of the District of Columbia. Inheriting a large fortune from his father, he had all the incentives to idleness usually born of opulence; but, though he lives in great elegance, and entertains with large hospitality, he has been all his life one of the hardest of workers. Standing in the foremost rank as a lawyer, he has been for years at the head of the law school of Columbia University, Washington. In addition to a pressing law practice, three evenings of the week, for many years, have found him in his place as the instructor of the intelligent, and, in many cases, hard-worked young men, who, with other employments by day, studied law with Judge Cox of nights. * * *

"Judge Cox is a slight, delicate-looking man, whose strong features and fine head indicate a mentality more potent than any mere physical force could express. He is somewhat bald, has mild blue eyes, a Roman nose, and an expression entirely benevolent. Said a friend: 'I cannot see how a man can amount to so much and assert himself so little.' This was the quality that brought down upon him so many anathemas during the Guiteau trial. His is not the material energy or enginery that vociferates, gesticulates, commands. Guiteau, who is an acute and nervous brute, cared no more for Judge Cox's gentle cry of 'Silence!' than he did for the fly he brushed from his nose. But the moment came when he cared. When Judge Cox's wise mind, clear sight, and just statement were set upon the facts of his awful crime, the criminal knew he had reached at last his moment of doom, and he quaked as utterly as if the vociferous insolence and insults with which he had filled every hour of his disgraceful presence in court had never been."

This, from what I know of Judge Cox, I believe to be true; and I may add that there was a heroism in his management of the case which should mark an era in judicial history. I do not, of course, appeal, by way of comparison, to the conduct of English judges in the seventeenth century, or even to that of French judges of the present day. Yet, in view of recent English criticisms of the Guiteau trial, it is well to look at some of the more conspicuous English prosecutions, and inquire whether the example they set is not one which it was right to reject.

When the few surviving regicides were brought to trial on the restoration of Charles II., they were overwhelmed with obloquy by the court as well as from the attorney general; they were not permitted to have counsel; when they attempted to argue in extenuation the political conditions of the times they were crushed under a storm of coarse abuse. In the later political trials under Charles II. and James II. the judges interfered to degrade, insult, and convict the prisoners with a savage and vulgar ferocity which Guiteau alone, were he now put on the bench, could exceed. I do not, of course, turn to such scenes as these, but I would take, by way of comparison, Lord Chief Justice Cockburn's course in the Tichbourne prosecution. As to that prosecution two remarks may be premised: In the first place, the claimant's guilt was very far from being as plain as that of Guiteau; in the second place, exasperating as was the claimant, the annoyance he gave the court was but slight

compared to that given by Guiteau. Vulgar and insolent as the claimant was, his vulgarity and insolence were trivial compared to those which Guiteau exhibited to court as well as to counsel. Yet observe, in this respect, the contrast: Chief Justice Cockburn sat with a full bench of associates, in all the splendors of his robes and of his high state, in the full consciousness of gifts of sarcasm and of invective such as few orators ever possessed, and of gifts of cross-examination and of advocacy such as scarcely any lawyer of his day could equal. These immense powers of sarcasm and of invective, during a trial which lasted a month, he did not shrink from pouring on the claimant's head. The claimant's coarse wit was turned against him by wit which, if not coarse, was at least domineering. The claimant's audacity was met by stern denunciations and fierce rebuke, which showed that the judge believed him to be guilty and determined to destroy his defence. The trial was a personal struggle between the defendant and the chief justice. The defendant, with all his cunning and doggedness was overmatched; and yet, when the trial was closed by a charge of the chief justice, which now occupies two large volumes, and which is the most consummate piece of judicial advocacy in existence, it was felt that although the defendant was probably guilty, he had not been fairly tried. Far different, however, is the feeling in respect to Guiteau's case. The temptation to Judge Cox to deal impatiently with Guiteau, let it be remembered, was far greater than was the temptation to Chief Justice Cockburn to deal impatiently with the claimant. The claimant's impudence was slight compared with that of Guiteau. The claimant had a defence on the merits; Guiteau had none. The claimant had a respectable body of adherents. Guiteau, with the single exception of a brother-in-law espousing his cause, from motives most honorable, but purely exceptional, had not a friend or sympathizer, but was the object of the execrations of the entire population of the United States. If ever a judge could have been naturally tempted to throw his personal force against a prisoner it was in this case of Guiteau. If ever personal disgust and contempt of a prisoner could have been naturally expected to enter into a judge's heart, it was on Guiteau's trial. So strong was this feeling, that, with a very few exceptions, the public press became impatient, when day after day Guiteau was permitted to pursue his course of unchecked profanity and indecency in the management of his own defence; and it was more than once stated that articles of impeachment were preparing in the house of representatives to test the competency of a judge who had permitted such outrages as those which Judge Cox was alleged to have permitted in the pending trial. The case, it was supposed, was aggravated by the fact that there was a reported case in which a federal judge of high authority had held that where a defendant on trial behaves so boisterously as to prevent the decent progress of the procedure, he can be removed from the court-room and the case go on in his absence. *U. S.* v. *Davis*, 6 Blatchf. 464. In the eighth edition of my book on Criminal Practice and Pleading, I said that "unless such a check be applied, the defendant, by violent and turbulent conduct, could at any time either bring his trial to an end, or compel its extension, under circumstances destructive of public decorum." This, I still hold; but I think that in Guiteau's case it was wise in Judge Cox not to use this extreme prerogative, however great the temptation was. In the first plea

the defence was *insanity*; and of insanity a man's demeanor on trial is one of the most important ingredients of proof. Had Guiteau been sent to his cell, and had the trial been pushed on in his absence, the jury might have hesitated to find a verdict of conviction, and even had there been a conviction there would have been a general feeling of discomfort, if not of disapproval. The case, in fact, would have gone on without either defendant or defendant's counsel, for the latter, under the circumstances, would readily have raised the opportunity thus given them of affording their client the only substantial aid in their power. A former noted trial in a federal court would have advised them how great this aid might have been. On the second trial of John Fries, in the circuit court of Philadelphia in 1800, Judge Chase, then presiding in that court, undertook at the opening of the case, before hearing argument from counsel, to declare that the court had determined to rule certain points as the law of treason in such a way as to reduce the questions of law left open for discussion on the trial. There was nothing in this very different from the practice that exists of a judge charging a grand jury on points of law about to arise on a trial before a petit jury; and as a matter of fact the points of law Judge Chase laid down were the conclusions adopted by the court on a former trial of the same defendant, on which a new trial had been granted on grounds which left the rulings of the court untouched. It was, however, indiscreet in Judge Chase to say, at the outset of the second trial, "These points we consider settled." He should have said, "We will hear argument on these points if desired." But he took the former course, and Mr. A. J. Dallas and Mr. Lewis, Fries' counsel, lawyers of great eminence, seized with alacrity the only way they had of saving their client by withdrawing from the case. Judge Chase saw at once his blunder, and implored them to come back, and offered to review the whole question. Back, however, they would not come, and they advised Fries to decline to accept other counsel, which he cheerfully did. He was convicted, almost in spite of Judge Chase's efforts; for that able and generous, but impetuous judge, whatever had been his former feelings, had now no desire to obtain the conviction of a man without counsel. Such a verdict, however, could not stand. Fries was pardoned by Mr. Adams, and Judge Chase was impeached by the house of representatives for this and other irregularities, and barely escaped conviction. It was well that he was not convicted, for his error was, after all, an error of judgment; and it was well that Fries was pardoned, since his execution under the circumstances, if not unjust, would have been unwise. And, although, had Guiteau been put out of the court-room, and a conviction ensued, his counsel having withdrawn, it is not likely that a pardon would have been granted, yet there would be a general feeling that his case had not been fully heard. The trial would have been looked back upon with sadness and disquiet. It cannot be so looked back upon now.

In the second place, aside from the technical question just discussed, there can be now no question that giving Guiteau full liberty in the court-room greatly conduced not only to the promptness and early unanimity of the action of the jury, but to the universal approval with which that verdict has been met. I confess that when the prosecution opened I had much doubt whether a conviction could be secured; and I believe that the general sentiment then

was that the case was on the border-line, and that the jury could not be expected to agree. This feeling, however, was gradually dispelled by Guiteau's course during the trial. Undoubtedly he showed great vanity and great ignorance, so far as the higher conditions of knowledge are concerned. But he showed abundantly that he acted in the tragic homicide perpetrated by him with a motive, which, however preposterous and villainous, was nevertheless as sane as are the motives of other criminals who take human life to gratify personal or social or political revenge, and with a full knowledge of the unlawfulness of his act. He proved on the trial that he was as sane as are the greater body of ruffians by whom life is taken; and he proved also that if the defence of insanity was good in his case, there are few cases of atrocious crimes in which it could not be sustained. Had he been removed from the courtroom, or "gagged," as was proposed, this condition would not have existed. Even if convicted, there would have been many who would have felt that the case was still one of doubt, and there would have been few who would have regarded the conviction and execution with entire approval.

The only points about Judge Cox's management of the trial which I question are the following: (1) The order in the court-room, so far as I can judge from the newspaper reports, might have been better preserved. It seems to me that marks of approval or disapproval among mere visitors could have been suppressed; and if this could not have been done, the court-room could have been cleared. This could have been done without the suspicion of invading the defendant's constitutional rights. (2) The trial might have been more compressed. To adjourn at 3 o'clock, or earlier if counsel desire it, is a great provocative to diffuseness; and the vanity of a defendant like Guiteau is stimulated by the assignment of so long a period for display.

More serious criticisms may be made on the conduct of the prosecution. It is difficult to understand why the case of the prosecution should have included proof of the difference between "stalwart" and "half-breed" republicans, and why a topic of this class, irrelevant certainly at that stage, should have been invoked by the prosecution. The ordinary course would have been to have proved the killing, and then rested. If the defendant wanted to show that he was in a state of insane political excitement about "stalwartism" and "half-breedism," then it was incumbent on him to show in what this excitement consisted. But this was for the defendant. For the prosecution to raise at the outset the question, not only was irregular as a matter of procedure, but introduced into the case a political feature which could not afterwards be got rid of, and which was the cause of much waste of time and of many disreputable interludes. Nor can the speeches of Mr. Porter be regarded with unmixed approval. Undoubtedly his cross-examination was judicious, so far as it drew Guiteau fully out. But his closing speech would have been far more effective had he refused to reply to Guiteau's interruptions. Cut from the speech its argumentative parts, and there remains a large mass of vituperative retorts between prosecution and defendant—retorts in which both parties employed the most virulent terms which the English language contains. In a review of Twiss' life of Lord Eldon by Mr. Sergeant Talfourd, himself an eminent lawyer, it is said that Lord Eldon, then Sir John Scott, when conducting state prosecution, "maintained a courtesy of demeanor which won the

respect of his most ardent opponents." * * * "He endured the most anxious labor to prevent " the penalties of the law " falling on one who, however guilty, was not subjected to its infliction by the plainest construction of the law." I have in my possession briefs of counsel in Fries' case, in which Mr. Rawle, United States district attorney, conducted the prosecutions, and the notes of other criminal prosecutions, in Gen. Washington's administration, in which Mr. Randolph and Mr. Bradford prosecuted as attorney general. In these notes, and in the printed reports of these cases, nothing is more remarkable than the scrupulous semi-judicial dignity of the district attorney and of the attorney general; and the same remark may be made as to the conduct of Mr. Wirt, during his long incumbency of the attorney general's chair, in the management of the many cases in which he prosecuted. It is questionable whether the district attorney or the attorney general, as the case may be, should not, in all cases not *quasi* civil, take exclusive control of the prosecution. But however this may be, the prosecution should be conducted with dignity, and without resort to personal altercation with and vituperation of a prisoner, no matter how vile he may be. And this is for two reasons. In the first place, what may be done in one case may be done in another, and all criminal trials would become scenes of disgraceful uproar and Billingsgate abuse. Men of dignity and delicacy would be excluded from criminal courts if these be the weapons to be used, and public justice would suffer a serious shock in the turmoil in which trials would be thrown. Secondly, the effect of altercations of this kind is in the prisoner's favor, and an unjust acquittal may be produced from a feeling of reaction against an indecorous prosecution.

The only question of doubt in the Guiteau case is that of jurisdiction. So far as concerns the reason of the question, apart from authority, Judge Cox's ruling cannot be assailed. Whether, however, the weight of authority is not against that ruling, is a point for the appellate court to determine.

FRANCIS WHARTON.

NOTE. The charge to the jury, delivered by Judge Cox in the celebrated Guiteau case, is a masterly exposition of the law governing the case. That it is borne out by the authorities on each point enunciated will be readily seen. As to the constitutional rights of the accused, he certainly did enjoy the right to a speedy and public trial by an impartial jury; and he was informed of the nature and cause of the accusation; was confronted with the witnesses against him, and had compulsory process for obtaining witnesses in his favor, and at the expense of the government; and he not only had the right to have the assistance of counsel, but also exercised the right to appear for himself as counsel. It was the duty of the court to lay down the law in this case, as the jury are not constituted judges of the law in criminal cases. *Pierce* v. *State*, 5 How. 504; *U. S.* v. *Morris*, 1 Curt. 23; *U. S.* v. *Shire*, Bald. 510; *U. S.* v. *Battiste*, 2 Sumn. 243.

To constitute malice in law, hatred, ill-will, and the like need not exist. *U. S.* v. *Ross*, 1 Gall. 624; *People* v. *Taylor*, 36 Cal. 255; *Stiles* v. *State*, 57 Ga. 183; *State* v. *Hays*, 23 Mo. 287; *Revel* v. *State*, 26 Ga. 280.

To constitute murder in the first degree the act should not only be wilful,

premeditated, malicious, and without legal justification, but it must have been connected with the former intention to take life; a fixed design that the act shall result in the death of the party assaulted; a fully formed and conscious design to kill, and with a weapon prepared for the purpose; and deliberation may be inferred from deliberately procuring the weapon for the avowed purpose of killing. *Com.* v. *Murray,* 2 Ashm. 41; *Com.* v. *Williams,* Id. 69; *Kennedy* v. *Com.* 14 Bush, 340; *Swan* v. *State,* 4 Humph. 136; *Riley* v. *State,* 9 Humph. 657; *Com.* v *Drum,* 58 Pa. St. 1; *Lanahan* v. *Com.* 84 Pa. St. 80; *King* v. *Com.* 2 Va. Cas. 78.

*As to the question of insanity.* Every defendant is presumed in law to be sane, and the burden of proof is on him to prove his insanity at the time of the commission of the act, subject only to the benefit of a reasonable doubt. *U. S.* v. *Lancaster,* 7 Biss. 440; *Ogletree* v. *State,* 28 Ala. 693; *U. S.* v. *Mc-Clare,* 17 Law Rep. 439; *Com.* v. *Hawkins,* 3 Gray, 463; *Com.* v. *Eddy,* 7 Gray, 583; *Com.* v. *Rogers,* 7 Met. 500; *Com.* v. *York,* 9 Met. 93; *State* v. *Jones,* 50 N. H. 369; *State* v. *Bartlett,* 43 N. H. 224; *State* v. *Pike,* 49 N. H. 399; *People* v. *McCann,* 16 N. Y. 58; *Bond* v. *State,* 23 Ohio St. 349; *People* v. *Robinson,* 1 Park. C. R. 649.

The criminal actor must be of sane mind, as an act does not make a man guilty unless his mind is guilty, and an insane person cannot, in the legal sense, have any intent. *Long* v. *State,* 38 Ga. 507.

Partial insanity can be an excuse only when it deprives the party of his reason in regard to the act charged. *State* v. *Lawrence,* 57 Me. 74; *State* v. *Huting,* 21 Mo. 464; *Bovard* v. *State,* 30 Miss. 600; *Com.* v. *Mosler,* 4 Pa. St. 264; *State* v. *Gut,* 13 Minn. 341. And it will not excuse if he had reason sufficient to distinguish between right and wrong as to the particular act. *Bovard* v. *State,* 30 Miss. 600.

A person may be sane and insane at different times, and insane and irresponsible as to one subject and sane and responsible as to another. *Hall* v. *Unger,* 2 Abb. U. S. 512; *Freeman* v. *People,* 4 Denio, 9; *Dew* v. *Clark,* 3 Ad. & Ec. Rep. 79. So that if the defendant was sane as to the crime committed, his insanity on other topics will not save him. *Bovard* v. *State,* 30 Miss. 600; *State* v. *Huting,* 21 Mo. 664; *Com.* v. *Mosler,* 4 Pa. St. 266. Or if he commit a crime in some other matter not connected with the *delusion,* such delusion constitutes no defence. *State* v. *Gut,* 13 Minn. 341; *State* v. *Huting,* 21 Mo. 464; *Bovard* v. *State,* 30 Miss. 600; *State* v. *Geddis,* 42 Iowa, 264; *State* v. *Mewherter,* 46 Iowa, 88; *Com.* v. *Mosler,* 4 Pa. St. 264.

"The true test of responsibility lies in the word 'power'—has the defendant the power to distinguish right from wrong, and the power to adhere to the right and avoid the wrong, and the power to govern the mind, body, and estate? And it is sufficient if power to do so is shown to have existed in reference to the particular act. If he was under such defect of reason from disease of mind as not to know the quality of the act he was doing, or was under such delusion as not to understand the nature of his act, or had not sufficient memory or reason to know he was doing wrong, then he was not responsible; but if he knew what he was doing, and that the act was forbidden by law, and took precautions to accomplish his purpose, and had power of mind enough

to know what he was doing at the time, then he is responsible, for it is conscious knowledge coupled with the act which constitutes crime." See Desty, Amer. Crim. L. § 23b. p. 62, and cases cited.

The prisoner himself endeavored to impress the jury with the idea that he had acted under an insane delusion that he had been commissioned by the Deity to commit the act, but he failed in his effort to so impress the jury. "Monomania is insanity only on a particular subject and with a single delusion; the mind, in other respects retaining its intellectual powers, has imbibed some single notion contrary to common sense or experience. It excuses only when it deprives the party of his reason in regard to the act charged to which it must immediately relate, and the delusion must be mental, not moral, and the act must be done *bona fide* and without malice, and not from motives of revenge for supposed injuries. If the delusion is only partial, the person is equally liable with a person of sound mind; or, if the delusion was an opinion that ordinary reason might have produced, it will not excuse from crime." Desty, Amer. Crim. L. § 25d, and cases cited.

Moral insanity co-existing with mental insanity has no foundation in law, and will not furnish an excuse from punishment for crime if he is conscious he is doing wrong, whether he has power over his conduct or not; so a blunted moral sense sufficient to free the mind from remorse is not insanity. See many decisions cited in Desty, Amer. Crim. L. § 25e, p. 69. The vagaries of the human mind shaped by religious opinions, superstitious belief, or inspirational rhapsodies, however they may affect the moral character, are in no sense to be considered as delusions constituting an insane condition of the mind, so as to excuse from punishment for crime.

Insanity to be an excuse from punishment should be such as dethrones the reason, overpowers the will, and creates an irresistible impulse to perform the act, while it deprives the party of the power to judge between right and wrong as to the particular act committed, as is established by abundant authority.

It is to be hoped that the charge of Judge Cox, its effect, and the verdict rendered, will exercise a salutary influence in the administration of justice in the future in cases of premeditated homicide, and that the long conflict of medical science, speculative at most, with its fine distinctions of mental and moral aberration, transmission by descent, physical convolutions of the brain, etc., etc., against legal science, upon the subject of human responsibility, will speedily approach an end, and criminals be subject to a reasonable legal test of responsibility for crime.—[ED.